UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MALACHY COGHLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1476 PLF |
| | ) | |
| NORMAN Y. MINETA, | ) | |
| U.S. Department of Transportation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEFENDANT'S MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, by and through undersigned counsel, hereby
moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)
(1) and (6).  In the alternative, Defendant submits that summary
judgment is appropriate pursuant to Fed. R. Civ. P. 56, because
there are no material facts in dispute and Defendant is entitled
to judgment as a matter of law.  In support of this Motion,
Defendant respectfully refers the Court to the accompanying

Memorandum Of Points And Authorities In Support Of Defendant's
Motion To Dismiss Or, In The Alternative, For Summary Judgment,
statement of material facts and proposed Order.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney

_____
R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

OF COUNSEL:

JULIA RHODES, ESQ.
Personnel & Labor Law Staff (AGC-30)
The Office of the Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W., 1st Floor
Washington, DC  20591

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALACHY COGHLAN,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            ) Civil Action No. 05-1476 PLF
                                    )
NORMAN Y. MINETA,                   )
U.S. Department of Transportation,)
                                    )
            Defendant.              )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I.   INTRODUCTION

     Plaintiff, an employee of the Federal Aviation
Administration ("FAA" or "Agency"), see Complaint, ¶ 1, alleges
that the Agency has engaged in age discrimination under theories
of both disparate treatment and disparate impact.  Specifically,
he alleges that the policies under the FAA's Core Compensation
System, which mandate that any annual increases awarded to
employees at the top of their pay band be awarded as lump sum
payments, discriminate against older workers.  A review of the
facts reveals procedural and substantive infirmities with the
Complaint that are fatal.  Thus, Defendant seeks dismissal or
summary judgment in favor of Defendant.

II.  PROCEDURAL HISTORY

Plaintiff admits his salary reached the pay band maximum[1] in January 2004.  See Complaint, ¶¶ 2-3, 8.  On August 10, 2004, the Plaintiff contacted an EEO Counselor alleging that the FAA had discriminated against him based on his age.  See Exhibit 3 (EEO Counselor's Report).  When the parties were not able to resolve the matter, Plaintiff received a notice of final interview on September 9, 2004.  Id.

In his EEO Complaint, dated September 27, 2004, Plaintiff alleged, in part, that the FAA's Core Compensation System resulted in disparate treatment.  See Exhibit 4 (Formal Complaint).  Specifically, Plaintiff challenged the policy that requires Organizational Success Increase ("OSI") and Superior Contribution Increase ("SCI") awards not be pay adjustments that increase the base salary if an employee is at the maximum of his pay band.  Id.  Plaintiff claimed to be a member of a group of approximately 829 employees who were treated differently than 4,158 other employees in the Core Compensation System who are receiving adjustments to their base pay even though they are at the pay band maximum.  He also alleged that the policy has a disparate impact based on age.  Id.  He further alleged, without any elaboration, that the difference in treatment between the two

---

[1]  An explanation of what a pay band maximum is contained below.  See also Exhibit 1, ¶ 4; Exhibit 2.

groups of employees is a violation of equal pay for equal work

principles.  As relief, Plaintiff sought the following:

> a.  correction of base pay for the last two years to
>     reflect an actual base pay increase;
> b.  correction of last two years pay for night,
>     Sunday, holiday and overtime differentials; and
> c.  payment of lost TSP contributions during last two
>     years due to the reduced base pay.

Id.  By decision dated December 13, 2004, the Departmental

Office of Civil Rights ("DOCR") for the Department of

Transportation ("DOT") dismissed the EEO complaint pursuant

to 29 C.F.R. § 1614.107(a)(1) due to the Plaintiff's failure

to state a claim,[2] and also pursuant to 29 C.F.R. §

1614.107(a)(2) as untimely.  See Exhibit 5 (Final Agency

Decision).  The DOCR also found that the EEO complaint was

subject to dismissal pursuant to 29 C.F.R. § 1614.107(a)(2),

because Plaintiff did not contact an EEO Counselor until

approximately four years after the permanent implementation

of the compensation system in 2000 and beyond 45 days after

receiving OSI and SCI lump sum payments that were not

reflected in his base pay.  Id.

Plaintiff filed an appeal dated January 12, 2005, which

was received by the Agency on January 25, 2005.  See Exhibit

---

[2]  The DOCR found that Plaintiff had alleged a generalized
grievance since the policy or practice which he was attacking was
applied to all FAA employees who are covered by the Core
Compensation System regardless of age.  See id.

-3-

6 (Plaintiff's Appeal).[3]  The EEOC affirmed the Agency's decision on March 11, 2005, <u>see</u> <u>Coghlan v. Mineta</u>, 2005 WL 636384, EEOC Appeal No. 01A52152 (Mar. 11, 2005), and Plaintiff filed a request for reconsideration.  By decision dated April 27, 2005, the EEOC affirmed the dismissal of Plaintiff's claims.  <u>Coghlan v. Mineta</u>, 2005 WL 1073773, EEOC Appeal No. 01A52152 (Apr. 27, 2005).  Additionally, the EEOC held that it was not persuaded by the Plaintiff's continuing violation claim nor his claim that each paycheck received was a separate actionable claim.  Instead, the EEOC held that the discriminatory act at issue was the receipt of a lump sum award in lieu of a salary increase and Plaintiff failed to present any persuasive argument to demonstrate why the time period in which he was required to contact an EEO Counselor should have been tolled.

On July 27, 2005, the Plaintiff filed the present action.

III.  <u>FACTUAL BACKGROUND</u>

A.  <u>FAA's Core Compensation Pay System</u>

Pursuant to 49 U.S.C. § 40122 (g)(1), the FAA Administrator was authorized to create a personnel management system that addressed the unique demands on the

---

[3]  Plaintiff did not file a brief in support of his appeal, but in a cover letter alleged that it was error for the Agency not to address his claim of a continuing violation.  <u>Id</u>.

-4-

Agency's workforce, including greater flexibility in the
compensation of personnel.  See Exhibit 1 (Declaration of
Christopher K. Early).  In response to this mandate, the
Agency convened a Compensation Committee.  Id.  The
committee created, in relevant part, the Core Compensation
Pay System, which was made available to employees in
September 1999.  Id., ¶ 2.

A key part of the system is that all employees were
converted from the General Schedule ("GS") to pay bands.
Id., ¶ 3.  The structure of each pay band is similar to the
GS system in that there are minimums and maximums assigned
to each pay band.  Id.; see also Exhibit 2.  The salary
ranges for positions in the core compensation system, as in
the GS system, are based upon the relative value of the work
performed by each position.  See Exhibit 1, ¶ 3.  However,
in contrast to the GS system, where changes within grades
are somewhat automatic and are primarily driven by continued
service, a key feature of the FAA's core compensation system
is that movement within the pay band is primarily driven by
organizational and individual performance that correlate to
the OSI and SCI pay adjustments.  Id.  Another distinct
feature of the new core compensation system, which was
widely publicized, is that the FAA Administrator has the
flexibility to increase or decrease the maximum pay range
for positions, rather than having the maximum pay range for

-5-

the pay bands automatically increase based upon the percentage of the raise and cost of living award received by federal employees. <u>Id.</u>; <u>see also</u> Exhibit 2 (Table showing Core Compensation Plan Pay Bands).

Effective on March 12, 2002, Section COMP-2.21C of the Human Resources Policy Manual ("HRPM") announced the consequence of an employee reaching a pay band maximum upon being converted into the core compensation system. <u>See</u> Exhibit 1, ¶ 6; Exhibit 7 (Comp-2.21C: Grandfathered employees in the core compensation plan of the HRPM). Essentially, those employees whose salaries immediately exceeded the pay band upon conversion[4] became covered by a "grandfather provision" which allowed them to receive OSI and SCI pay adjustments as increases to their base pay. <u>See</u> Exhibit 1, ¶ 4.[5]  This Section only applied to the position

---

[4]    The date of conversion was not the same for all FAA employees.  While all non-bargaining unit employees were converted on April 23, 2000, the conversion for some bargaining unit employees occurred later and depended on when the FAA and the relevant union reached agreement.

[5]    There are exceptions to these rules beyond that pool of individuals who were grandfathered. <u>See</u> Exhibit 8.  In July of 2004, there were 4158 bargaining unit employees who exceeded the maximum of their pay bands, but still received any annual pay adjustments as increases to their base pay. <u>Id</u>.  Of this group of employees, 95.2% were 40 years of age or older.  Exhibit 1, ¶ 9.
    These exceptions to Section Comp-2.21C were made pursuant to the National Air Traffic Controllers Association ("NATCA") contract for Engineers and the Professional Airway Systems Specialist ("PASS") contract for technicians.  Each of these contracts contains articles specifying that employees in positions covered by the collective bargaining agreements will

that an employee held at the time of conversion, so if an
employee voluntarily moved to another position or the salary
for the position fell within the pay range for his or her
assigned pay band, then the employee would no longer be
covered by the "grandfather provision."  Id.; see also
Exhibit 1, ¶ 4.

In contrast, all employees whose salaries after the
initial conversion exceeded the maximum of the pay band were
to receive any pay adjustments as lump sum payments.  See
Exhibit 9 (HRPM, COMP-2.4C: Annual Pay Adjustments).  The
annual OSI and SCI disbursements are made in January or
early February of each year.  Id.

On a yearly basis the FAA Administrator and
Compensation Committee review such things as a market
survey, which includes the aviation and aerospace industries
as well as incorporates market data from thousands of other
areas, to get a comprehensive picture of the community's
salary situation.  See Exhibit G, ¶ 7; see also Exhibit 10
(HRPM, COMP-2.2C: Pay Bands in Core Compensation System).
This review allows the FAA to determine whether its salaries
are competitive and should remain unchanged or are not

---

receive any annual pay adjustments as increases to their "basic
pay."  Id.  In others words, due to collective bargaining
agreements, there are employees currently not subject to Chapter
Comp-2.4C of the HRPM.  Id.

competitive and should be changed.  See Exhibit 1, ¶ 7;
Exhibit 11 (2004 Summary of Market Survey).

As a result of the annual review process, the pay bands
were increased in 2001 and 2002.  See Exhibit 12
(Administrator's Announcements from 2000 through the
present).  However, based on the market surveys, the
Administrator did not increase the pay bands in 2003, 2004,
or 2005.  Id.  In fact, all employees were notified, through
briefings and broadcast messages as well as through the
policy website, of the manner in which pay bands would be
adjusted and of the consequences of reaching the pay band
maximum for a position.  See Exhibit 13.  Additionally, by
January 2003, this message was reaffirmed when all FAA
employees were notified through a broadcast message from the
Administrator that the pay band for 2003 would not be
changed.  See Exhibit 1, ¶ 7.  The FAA Administrator's
broadcast message merely reiterated pay policies about which
employees had previously been notified.  Id.

Briefings about the elements of the Core Compensation
Pay system were given to all FAA employees.  See Exhibit 1,
¶¶ 5-6.  In addition, pamphlets containing information about
elements of the plan, including Chapters Comp-2.4C and
2.21C, were given to all employees and the information was
also available through a website dedicated to communicating
details about the plan.  See Exhibit 1, ¶¶ 5-6.  In this

-8-

context, Plaintiff received one or more Standard Form 50s
("SF-50") that reflected that his salary was at the pay band
maximum for his position and also indicating that he was
receiving a lump sum payment.  See Exhibit 14 (SF-50s).
Plaintiff was in Pay Band J, which had a maximum base pay
figure of $102,300.00.  See Exhibit 2 at 1; Exhibit 14.[6]
The SF-50s approved on January 11, 2004 revealed that his
Base Pay was limited to the $102,300 figure, but Plaintiff
was also eligible for a lump sum group cash award that did
not increase his base pay.  See Exhibit 14 at 1-3.  Thus, by
January 2004, Plaintiff was given further actual notice
regarding the consequences of the core compensation policies
discussed above.  Id.; see Exhibit 1, ¶¶ 2-7.

    B.  Background on the Employees' Concerns

    Prior to the filing of the instant action, another FAA
employee, Mark Lash, raised the concern that the FAA
Administrator's failure to increase the pay band maximums
was negatively impacting the more senior and experienced
employees in the workforce who were 40 years old or older.
Mr. Lash raised his concerns about the FAA's pay policy with
representatives in Congress; Stephen Barr of the Washington
Post; the Federal Times; the FAA Administrator and other
senior FAA executives; and approximately 829 FAA employees

---

    [6] Adjustments were also approved on May 24, 2004, but again
Plaintiff waited beyond 45 days to seek EEO counseling.  See
Exhibit 14 at 4-6; Exhibit 3 at 2.

who in 2004 were at the pay band maximum and were receiving annual pay adjustments as lump sum payments.  In fact, Mr. Lash encouraged, through repeated electronic message (e-mail) transmissions, all 829 employees to file individual complaints of discrimination until further investigation and consultation could occur in the effort to obtain legal representation for a class action.  There came a point in his campaign when Mr. Lash passed the torch for pursuing this complaint of discrimination to Timothy O'Hara, who became the individual with whom Plaintiff pursued a class action on the same issue in the administrative forum.[7]

It was in the wake of this call to action that the Plaintiff filed his individual complaint of discrimination. In other words, well before filing his individual complaint, the Plaintiff and other employees had actual notice of the FAA's compensation policy regarding the award of annual pay increases and some argued that this policy had class-wide discriminatory implications.  Yet, when Plaintiff filed his individual complaint of discrimination in August of 2004, he did not advise the EEO Counselor that he sought to represent a class of similarly situated employees.  See Exhibit 4.  In contrast, as Plaintiff admits in the Complaint, he later sought to be a class agent with regard to the annual pay

---

[7]  The Agency advises that that class action has recently been withdrawn by the complainants.

-10-

adjustments made in 2005 to the present.  See Complaint, ¶ 22.  In light of his later conduct, Plaintiff clearly understood the difference between an individual and class complaint as well as the manner in which to prosecute both types of complaint.

        C.  Plaintiff Affected by the Core Compensation System

        On January 11, 2004, the Plaintiff received a portion of his annual pay adjustment as an increase to his base pay, which rose to the pay band maximum and the remainder of his annual pay adjustment as a lump sum award.  See Exhibit 2 at 1; Exhibit 14.  In other words, by the very receipt of the lump sum, Section 2.4C was applied to Plaintiff and he felt its effect by January 11, 2004.  Id.  Yet, Plaintiff did not contact an EEO Counselor about his individual complaint of age discrimination until, seven months later on August 10, 2004.  Exhibit 3 at 2.[8]

                        IV.  ARGUMENT

        A.  The complaint must be dismissed due to
            the Plaintiff's failure timely to
            exhaust administrative remedies.

        Under the Age Discrimination in Employment Act ("ADEA"), a federal employee may bring a claim of age

_____

[8]  The Agency is unaware of any evidence that Plaintiff provided notice, by February 12, 2004, to the EEOC of any intent to file an ADEA complaint directly in district court.  Nor does Plaintiff allege having done so.  See Complaint, ¶¶ 7-9 (describing Plaintiff's efforts to exhaust administrative remedies, which include no allegations that Plaintiff filed any notice of intent to sue with the EEOC).

discrimination directly to federal court if he gives at
least 30 days notice to the EEOC of his intent to sue and he
files this notice within 180 days after the alleged
discriminatory conduct.  <u>See</u> 29 U.S.C. § 633a(d); <u>Rann v.
Chao</u>, 209 F. Supp. 2d 75, 78-79 (D.D.C. 2002); <u>aff'd</u> 346
F.3d 192 (D.C. Cir. 2003); <u>cert</u>. <u>denied</u>, 125 S.Ct. 35
(2004).  Alternatively, an employee may elect to pursue
claims  administratively.  If the employee is dissatisfied
with the result of the administrative proceedings, he may
file suit in federal court once he has fully exhausted his
administrative remedies.  <u>See</u> 29 U.S.C. § 633a(b); <u>Stevens
v. Dep't. of Treasury</u>, 500 U.S. 1, 5-6 (1991) (describing
the two routes by which a federal employee may bring an ADEA
claim to federal court).  These time limits in the ADEA
operate like statutes of limitations, and exhaustion of
administrative remedies is considered a prerequisite to
bringing a federal action.  <u>See</u> <u>Brown v. GSA</u>, 425 U.S. 820,
829-33 (1976); <u>Washington v. Washington Metropolitan Area
Transit Authority</u>, 160 F.3d 750, 752 (D.C. Cir. 1999); <u>Bayer
v. Dep't. of Treasury</u>, 956 F.2d 330, 332 (D.C. Cir. 1992).
Therefore, if a plaintiff has not met the filing
requirements under the statutes, his federal court action is
not timely. <u>See</u> <u>Brown v. Marsh</u>, 777 F.2d 8, 13 (D.C. Cir.
1985) ("[T]he plaintiff who fails to comply, to the letter,
with administrative deadlines 'ordinarily will be denied a

judicial audience.' ") (citation omitted).  Here,

Plaintiff's Complaint should be dismissed for failure timely

to exhaust administrative remedies.

> 1.   The Complaint must be dismissed due to the
>      Plaintiff's failure to timely contact an
>      EEO Counselor regarding class-wide
>      allegations of age discrimination

As the Plaintiff admits, he elected to pursue his

individual age discrimination complaint through the

administrative EEO process.  Complaint, ¶¶ 7-9.  Yet, he did

not seek to represent a class based on his discrimination

allegations when he contacted an EEO Counselor on August 10,

2004.  Rather, he made a vague statement that he "learned

about the disparate treatment for those over 40 on June 28,

2004. [He] hit the maximum of his pay band in January 2004.

He received OSI/SCI's as a partial lump sum payment with the

remainder being added to base pay."  Exhibit 3 at 2.

Plaintiff, although he has demonstrated how to distinguish

an individual complaint from a class complaint, see

Complaint, ¶ 11, did not pursue class claims when he

contacted an EEO Counselor.   See Complaint, ¶ 22; Exhibit

3; Exhibit 4.  Therefore, he has failed to exhaust his

administrative remedies with regard to a class-wide claim of

age discrimination.  See Artis v. Greenspan, 158 F.3d 1301

(D.C. Cir. 1998)(holding that a failure to present class-

wide claims during EEO Counseling was a failure to exhaust

-13-

administrative remedies thereby depriving the court of
jurisdiction).

    2.  <u>Plaintiff's individual claim was untimely anyway.</u>

Even assuming that Plaintiff's contact with an EEO
Counselor regarding his individual complaint of age
discrimination was sufficient to raise class-wide
allegations, the Complaint must still be dismissed due to
his untimely contact with an EEO Counselor regarding any
allegations of age discrimination related to the FAA's Core
Compensation System.  EEOC regulations require that an
aggrieved person must contact a Counselor within 45 days of
the "matter alleged to be discriminatory" or, in the case of
a personnel action, "within 45 days of the effective date of
the action."  29 C.F.R. § 1614.105(a)(1).  The
interpretation of the present Complaint as either a "matter
alleged to be discriminatory" or a "personnel action" will
control the trigger by which timeliness is measured.  If the
complaint is interpreted as challenging a personnel action,
then the trigger is the date on which the personnel action
took effect, <u>i.e.</u>, when the class agent received his annual
pay increase as a lump sum instead of entirely as an
increase to his base pay.  <u>See</u> <u>Scarborough v. Natsios</u>, 190
F. Supp. 2d 5, 15 (D.D.C. 2000)(holding that the plain
language of the regulation indicates that the 45-day filing
period begins to run from the effective date of his

-14-

mandatory retirement and not from his notice that he would
be subject to mandatory retirement on a specific date in the
near future.)

If, however, the complaint is interpreted and
characterized as being about a practice that is alleged to
be discriminatory, then the triggering event for the 45-day
period for EEO contact begins when the injury accrues, i.e.,
when the individual knew or through the exercise of
reasonable diligence should have known of the discriminatory
nature of the practice.  See, e.g., Delaware State College
v. Ricks, 449 U.S. 250, 257 (1980)(finding that injury
occurred when notified of denial of tenure decision and not
when actually terminated); Schrader v. Tomlinson, 311 F.
Supp.2d. 21, 27 (D.D.C. 2004)(citations omitted) (holding
that a plaintiff "may not rely on the continuing violation
theory where [he] was aware of the discriminatory conduct at
the time it occurred."); Kilpatrick v. Riley, 98 F. Supp.2d.
9, 18 (D.D.C. 2000) (holding that continuing violation
theory did not apply to plaintiff's discrimination claim,
which occurred in 1980, where plaintiff filed an EEO
complaint in 1991 and, according to plaintiff's own factual
account, by 1980 he already believed that his employer
systematically discriminated); Rendon v. District of
Columbia, 1986 WL 15446, *3  (D.D.C. Nov. 19, 1986) (holding
that plaintiff's claims of race discrimination that she knew

-15-

or had reason to know about and that were not timely filed
with the EEOC were barred from consideration by the Court);
Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267 (7th Cir.
1995)(finding that Thelen discovered the injury when
informed of his discharge and not when he learned who was
hired to replace him); Oshiver v. Levin, Fishbein, Sedran &
Berman, 38 F.3d 1380, 1386-87 (3rd Cir. 1994)(finding that
Oshiver discovered the injury when informed of her discharge
and not when she learned who was hired to replace her).
Plaintiff's theory that he will suffer some harm through
reduced retirement does not save his otherwise untimely
claim.  See National Railroad Passenger Corp. v. Morgan, 536
U.S. 101 (2002); Florida v. Long, 487 U.S. 223, 239 (1988).
Thus, for the reasons described in greater detail below,
regardless of whether the claim is treated as a personnel
action or a matter alleged to be discriminatory, the
Complaint must be dismissed due to the Plaintiff's failure
to contact an EEO counselor within 45 days.

     Eligible FAA employees received OSI/SCI awards in
January of 2004.  The Plaintiff acknowledges that he
received his 2004 OSI/SCI award as a partial lump sum
payment, i.e. without any corresponding increase in his base
pay in January 2004.  See Complaint, ¶¶ 8, 10.  Yet, he did
not contact an EEO Counselor until August 10, 2004, which is
well beyond the 45 day period.  See Scarborough, 190 F.

-16-

Supp. 2d at 15; 29 C.F.R. § 1614.105(a)(1). The Plaintiff has failed to allege or proffer any evidence warranting equitable tolling of this deadline. Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (untimely exhaustion of administrative remedies is a defense); see Bayer v. United States Dep't. of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992)(the plaintiff bears the burden of pleading and proving equitable reasons for his or her failure to comply with the 45-day time limit).

Moreover, as Plaintiff states in his formal EEO complaint, for two years prior to filing his complaint he and others suffered from the alleged discriminatory practice of awarding annual pay adjustments only as lump sum payments to employees at the maximum of their pay bands. See Exhibit 4 at 2. Given Plaintiff's admitted awareness, it is well established that a continuation violation does not apply to the Plaintiff's discrimination claim. See Kilpatrick, 98 F. Supp.2d. at 18.

Throughout the Complaint, Plaintiff references an allegedly discriminatory practice under the Core Compensation System of allegedly "failing to provide annual increases in base salary and paying cash awards that are not included in the base salary or in the computation of class members' retirement benefits, constitute[ing] discrimination on the basis of age." See, e.g. Complaint, ¶¶ 25, 26, and

-17-

28.   All FAA employees were notified, well before April 2000, and no later than March 12, 2002, of the consequences of their salaries reaching the pay band maximum, _i.e._, that they would receive any annual pay adjustment as a lump sum payment.  Exhibit 1, ¶¶ 2-6.  Plaintiff reached his pay band maximum by January 2004.  See Complaint, ¶ 7-8, 10-11.  Yet, the Plaintiff did not contact an EEO Counselor until August 10, 2004.  In light of these events, Plaintiff, who is himself a lawyer, _see_ Complaint, ¶ 20, failed to contact an EEO Counselor in a timely manner.  He knew, or should have known, about the practice that he now seeks to challenge, _i.e._, the implementation of Comp-2.4C, but waited too long to assert his rights.  Indeed, he waited until 2 years after the practice was implemented and approximately 6 months after being advised that his own base pay would not be increased in the amount of his lump sum payment.[9]  His claims were, thus, not timely exhausted.

_____

[9]   Arguably, Plaintiff should have sought EEO counseling 45 days after learning of the Agency's adoption of the offending provision.  See Harris v. Federal Aviation Administration, 215 F. Supp. 2d. 209 (D.D.C. 2002) (holding that an agency action that merely reiterates or affirms an earlier agency decision does not trigger the statute of limitations under the Administrative Procedures Act), aff'd, 353 F.3d 1006 (D.C. Cir.), cert. denied, 125 S.Ct. 34 (2004); see also Village of Bensenville v. Federal Aviation Administration, 376 F.3d 1114, 1119-20 (D.C. Cir. 2004).  The Court need not address this issue, however, because Plaintiff was not timely even if the 45-day period is calculated from the later date, when he learned that his base pay would not be increased in the amount of his lump sum award in January 2004, or even from the second time that he received such a lump sum award under the policy, in May 2004.  See Exhibit 14.

     B.  Plaintiff's disparate impact claim must be
         dismissed for failure to state a claim and
         lack of jurisdiction given the lack of any
         waiver of sovereign immunity for such a
         claim.

     In Smith v. City of Jackson, 125 S. Ct. 1536 (2005), the

Supreme Court analyzed the validity of private-sector[10] age

discrimination disparate impact cases.  There, the Court began

with a review of the statutory language.  Section 4(a)(2) of the

ADEA of 1967, which was codified as 29 U.S.C. § 623(a)(2),

provides that it shall be unlawful for an employer "to limit,

segregate, or classify his employees in any way which would

deprive or tend to deprive any individual of employment

opportunities or otherwise adversely affect his status as an

employee, because of such individual's age . . . ."  This

language is virtually identical to Section 703(a)(2) of the

Civil Rights Act of 1964 (Title VII), except for the inclusion

of age as the basis of discrimination.  In light of the fact

that Congress used the same language in two statutes having

similar purposes, the Court affirmed the principle that "it is

appropriate to presume that Congress intended that text to have

the same meaning in both statutes." Smith, 125 S.Ct. at 1541

(citing Northcross v. Board of Ed. Of Memphis City Schools, 412

_____

     [10]  The ADEA's federal-sector provisions are separate from
the private-sector provisions and are intended to be interpreted
independently.  See 29 U.S.C. § 633a(f) (2000) (stating that none
of the non-federal portions of the ADEA applies to federal
employers); see also Lehman v. Nakshian, 453 U.S. 156, 168 (1981)
(noting that the federal provisions of the ADEA are "unaffected
by other sections").

                              -19-

U.S. 427, 428 (1973)(per curiam)).  Therefore, the Court
examined how Section 703(a)(2) had been interpreted, including
Griggs v. Duke Power Co., 401 U.S. 424 (1971).

     In Griggs, an employer imposed an education or testing
requirement as a condition of employment or transfer.  The
record revealed that these qualification standards, which were
not related to performance, served to disqualify African-
American applicants at a higher rate than white applicants.
The Supreme Court interpreted Section 703(a)(2) as addressing
the consequences or effects of policies or practices.  As a
result, the Court determined that the private sector employees
were able to advance a disparate impact theory of discrimination
regarding the employer's facially neutral policy.  Based on this
precedent and the similarity in the statutory language, the
Court in Smith determined that Section 623(a)(2) authorized the
prosecution of an adverse impact complaint based on age in a
case involving the private sector.  The Smith decision does not
discuss, analyze, or address Section 633a of the ADEA, which
prohibits age discrimination in federal employment.  Smith, 125
S. Ct. at 1536.

     Accordingly, with respect to Section 633a, a determination
as to the viability of disparate impact claims must begin with
an examination of the statutory language.  It is well
established that "[s]tatutory construction" must begin with the
language employed by Congress and the assumption that the

-20-

ordinary meaning of that language accurately expresses the legislative purpose." Engine Mfrs. Ass'n v. South Coast Air Quality, 541 U.S. 245, 252-53 (2004)(quoting Park 'N Fly, Inc. v. Dollar Park & Fly, 469 U.S. 189, 194 (1985)).  In addition, it is a general principle of statutory construction that "when Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion."  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 453 (2002)(quoting Russello v. United States, 464 U.S. 16, 23 (1983)). See also United States v. Bean, 537 U.S. 71, 76 (2002)(citing N.Singer, *Sutherland on Statutes and Statutory Construction* §46:06, p. 194 (6th ed. 2000), for the proposition that the use of different terms within related statutes generally implies that different meanings were intended).  Accordingly, courts must presume that a legislature says in a statue what it means and means in a statute what it says.  Barnhart, 534 U.S. at 450.[11]  In addition, where "the statutory language used is unambiguous, the [judicial] inquiry ceases." Id., at 454 (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)); Whitfield v. United States, 125 S. Ct. 687, 692 (2005).

---

[11]  The Court also concluded that, even if a court decides to examine the legislative history of an unambiguous statute, floor statements from members of Congress cannot amend clear and unambiguous language of a statute.  Barnhart, 534 U.S. at 457.

Moreover, Section 633a serves only as a limited waiver of the federal government's sovereign immunity.  As a result, it must be strictly construed in favor of the United States, see Lane v. Peña, 518 U.S. 187, 192 (1996); Settles v. U.S. Parole Comm'n, No. 03-5368 slip op. at 12 (D.C. Cir. Nov. 8, 2005), and the terms of that waiver "must not be enlarged beyond such boundaries as the statute's language plainly requires," Nowd v. Rubin, 76 F.3d 25, 27 (1st Cir. 1996) (internal quotation omitted) (holding that Section 633a does not authorize award of attorney's fees); Villescas v. Abraham, 311 F.3d 1253, 1259 (10th Cir. 2002) (Section 633a does not waive immunity from damages for emotional distress in retaliation claim); Lehman v. Nakshian, 453 U.S. 156, 168-69 (1981)(holding that Section 633a did not entitled federal employees to a jury trial); Laird v. Nelms, 406 U.S. 797 (1972)(holding that, although the Federal Tort Claims Act made the United States liable for the "negligent or wrongful act or omission of any employee of the Government ..., if a private person, would be liable to the claimant," 28 U.S.C. § 1346(b), the United States nonetheless was not liable for the entire range of conduct classified as tortuous under state law).  Section 633a pertains to "all personnel actions affecting employee or applicants . . . who are at least 40 years of age."  29 U.S.C. § 633a.  Nothing in this language plainly establishes that disparate impact claims are viable against a federal employer.  Section 633a, unlike Section

-22-

623(a)(2) of the ADEA and Section 703(a)(2) of Title VII, makes no reference to practices, classification, or segregation, and it makes no reference to disparate impact. Thus, the language of the statute itself demonstrates that the scope of the actions covered by 633a are personal in nature and relate more naturally to claims of disparate treatment based on intentional action as opposed to broad neutral policies that later turn out to have an impact on a group of employees over the age of 40.[12] The fact that Congress did not include language authorizing federal-sector suits based on disparate impact claims is significant and shows no clear intent that disparate impact claims under the ADEA are actionable against the federal government. See Ellis v. United Airlines, Inc., 73 F.3d 999, 1008 (10th Cir. 1996). Thus, since a clear waiver of sovereign immunity has not been provided for under Section 633a, sovereign immunity prevents a disparate impact claim against the federal government from being

_____

[12]    If Congress had intended to authorize federal employees to file disparate impact claims based on age, it could easily have added a provision in Section 633(a) that mirrored either Section 623(a)(2) of the ADEA or Section 703(a)(2) of Title VII, codified as 42 U.S.C. § 2000e-2(k). Instead, Congress took the opposite tack and specifically separated the federal- and private-sector provisions. See 29 U.S.C. § 622a(f). And, although Congress amended Title VII to include disparate impact claims in 1991, see Pub. L. 102-166, §105 (adding sub-part (k) to 42 U.S.C. § 2000e-2), Congress did not take a similar action with regard to Section 633a of the ADEA, although it amended Section 633a both in 1995 and 1998. See Pub. L. 104-1, § 201(c)(2) (Jan. 23, 1995) (inserting provisions relating to Government Printing Office and General Accounting Office and struck out provisions relating to legislative branch.); Pub. L. 105-220, § 341(b) (August 7, 1998) (inserting "in the Smithsonian Institution," preceding "and in the Government Printing Office.")

-23-

viable based solely upon an analogy to the other portions of the
ADEA or to Title VII.[13]

The Smith decision does not address Section 633a, and given
the clear rule that sovereign immunity must be waived before an
action can be allowed against the federal government,
Plaintiff's assumption that disparate impact claims based on age
filed against the Federal government are valid does not comport
with either the plain language of the statute or the limited
holding of the Smith case.  See Breen v. Mineta, Civil Action
No. 05-654, Memorandum Opinion and Order at 16 (D.D.C. Sept. 20,
2005) (denying preliminary injunction and concluding that "there
was good reasons to doubt that plaintiffs have a cognizable ADEA
disparate impact claim against the FAA and DOT [because] . . .
there is no basis on which to conclude that the federal
sovereign has waived its immunity from such suits, which must be
express, not implied and inferred through interpretation.").[14]

---

[13]  It should be noted that a finding that Congress did not
intend for Section 633a to permit disparate impact claims to be
filed against the federal government is consistent with the
recommendations contained in the report that the Secretary of
Labor Willard Wirtz submitted, which was relied on in drafting
the ADEA, entitled, Report of the Secretary of Labor, the Older
American Worker: Age Discrimination in Employment (June 1965).
For, as noted by Justice O'Connor in her dissenting opinion in
Smith, the stated purpose of the ADEA, as contained in Section
621(b), was to prohibit "arbitrary age discrimination" in
employment, which as described in the Wirtz Report equated to
disparate treatment.  In contrast, the Wirtz Report suggested
that neutral policies with a disparate impact could be addressed
through non-coercive measures.
[14]  Cf. Lumpkin v. Brown, 898 F.Supp. 1263 (N.D. Ill.
1995)(recognizing a federal employee's right to file
disparate impact claims under the ADEA).  The Lumpkin court

For these reasons, Plaintiff's asserted disparate impact claim
finds no clear waiver of sovereign immunity in the statute upon
which he seeks to rely.  Accordingly, this claim is subject to
dismissal even if the Court were convinced that Plaintiff's
claims were otherwise timely.

---

cites no legal authority to support its conclusion.
Moreover, the decision is not based upon any principles of
statutory construction.  Instead, the court bases its
conclusion on an assumption about how the United States
Court of Appeals for the Seventh Circuit would rule since
Section 633a was adopted three years after the Griggs
decision. Id.  Indeed, a later opinion in Lumpkin noted that
the Court's conclusion regarding the disparate impact theory
under Section 633(a) "is *not* necessary to allow plaintiffs
to prevail here, for they have already done so in terms of
disparate treatment." Lumpkin v. Brown, 960 F.Supp. 1339,
1352 (N.D. Ill. 1997).  In light of the analytical flaw,  as
well as the fact that the case constitutes dictum from the
Northern District Court of Illinois that has not been cited
in any other decision, Lumpkin should not be considered
either binding or persuasive precedent.

V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiff's complaint, or, in the alternative, enter summary judgment in favor of Defendant.

Respectfully submitted,

_____

KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney

_____

R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney

_____

W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

OF COUNSEL:

JULIA RHODES, ESQ.
Personnel & Labor Law Staff (AGC-30)
The Office of the Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W., 1st Floor
Washington, DC  20591

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
MALACHY COGHLAN,              )
                             )
             Plaintiff,      )
                             )
       v.                    ) Civil Action No. 05-1476 PLF
                             )
NORMAN Y. MINETA,            )
U.S. Department of Transportation,)
                             )
             Defendant.      )
_____)
```

DEFENDANT'S STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE DISPUTE</u>

Pursuant to Local Rule 7(h), Defendant respectfully submits this statement of material facts as to which there is no genuine dispute.

1.  Pursuant to 49 U.S.C. § 40122 (g)(1), the FAA Administrator was authorized to create a personnel management system that addressed the unique demands on the Agency's workforce, including greater flexibility in the compensation of personnel.  <u>See</u> Exhibit 1 (Declaration of Christopher K. Early).

2.  In response to this mandate, the Agency convened a Compensation Committee.  <u>Id</u>.  The committee created, in relevant part, the Core Compensation Pay System, which was made available to employees in September 1999.  <u>Id</u>., ¶ 2.

3.  A key part of the system is that all employees were converted from the general schedule ("GS") to pay bands.  <u>Id</u>., ¶ 3.

4.  The structure of each pay band is similar to the GS

system in that there are minimums and maximums assigned to each pay band. Id.; see also Exhibit 2. The salary ranges for positions in the core compensation system, as in the GS system, are based upon the relative value of the work performed by each position. See Exhibit 1, ¶ 3.

5. However, in contrast to the GS system, where changes within grades are somewhat automatic and are primarily driven by continued service, a key feature of the FAA's core compensation system is that movement within the pay band is primarily driven by organizational and individual performance that correlate to the Organizational Success Increase ("OSI") and Superior Contribution Increase ("SCI") pay adjustments. Id.

6. Another distinct feature of the new core compensation system, which was widely publicized, is that the FAA Administrator has the flexibility to increase or decrease the maximum pay range for positions, rather than having the maximum pay range for the grades automatically increase based upon the percentage of the raise and cost of living award received by federal employees. Id.; see also Exhibit 2 (Table showing Core Compensation Plan Pay Bands).

7. Effective on March 12, 2002, Section COMP-2.21C of the Human Resources Policy Manual ("HRPM") announced the consequence of an employee reaching a pay band maximum upon being converted into the core compensation system. See Exhibit 1, ¶ 6; Exhibit 7 (Comp-2.21C: Grandfathered employees in the core compensation

-2-

plan of the HRPM).

8.  Essentially, those employees whose salary immediately exceeded the pay band upon conversion became covered by a "grandfather provision" which allowed them to receive OSI and SCI pay adjustments as increases to their base pay.  See Exhibit 1, ¶ 4.

9.  Section COMP-2.21C of the HRPM only applied to the position that an employee held at the time of conversion, so if an employee voluntarily moved to another position or the salary for the position fell within the pay range for his or her assigned pay band, then the employee would no longer be covered by the "grandfather provision."  Id.

10.  In contrast, all employees whose salaries after the initial conversion exceeded the maximum of the pay band were to receive any pay adjustments as lump sum payments.  See Exhibit 9 (HRPM, COMP-2.4C: Annual Pay Adjustments).

11.  The annual OSI and SCI disbursements are made in January or early February of each year.  Id.; Exhibit 1, ¶¶ 6-8.

12.  On a yearly basis the FAA Administrator and Compensation Committee review such things as a market survey, which includes the aviation and aerospace industries as well as incorporates market data from thousands of other areas, to get a comprehensive picture of the community's salary situation.  See Exhibit 1, ¶ 7.

13.  This review allows the FAA to determine whether its

-3-

salaries are competitive and should remain unchanged or are not competitive and should be changed. See Exhibit 1, ¶ 7; Exhibit 11 (2004 Summary of Market Survey).

14. As a result of the annual review process, the pay bands were increased in 2001 and 2002. See Exhibit 12 (Administrator's Announcements from 2000 through the present).

15. However, based on the market surveys, the Administrator did not increase the pay bands in 2003, 2004, or 2005. Id.

16. In fact, all employees were notified, through briefings and broadcast messages as well as through the policy website, of the manner in which pay bands would be adjusted and of the consequences of reaching the pay band maximum for a position. See Exhibit 13.

17. Additionally, by January 2003, this message was reaffirmed when all FAA employees were notified through a broadcast message from the Administrator that the pay band for 2003 would not be changed. See Exhibit 1, ¶ 7.

18. The FAA Administrator's broadcast message merely reiterated pay policies about which employees had previously been notified. Id.

19. Briefings about the elements of the Core Compensation Pay system were given to all FAA employees. See Exhibit 1, ¶¶ 5-6.

20. In addition, pamphlets containing information about

-4-

elements of the plan, including Chapters Comp-2.4C and 2.21C, were given to all employees and the information was also available through a website dedicated to communicating details about the plan. See Exhibit 1, ¶¶ 5-6.

21. Plaintiff received one or more Standard Form 50s ("SF-50") that reflected that his salary was at the pay band maximum for his position and also indicating that he was receiving a lump sum payment. See Exhibit 14 (SF-50s).

22. Plaintiff was in Pay Band J, which had a maximum base pay figure of $102,300.00. See Exhibit 2 at 1; Exhibit 14.

23. On January 11, 2004, the Plaintiff received a portion of his annual pay adjustment as an increase to his base pay, which rose to the pay band maximum and the remainder of his annual pay adjustment as a lump sum award. See Exhibit 2 at 1; Exhibit 14.

24. The SF-50s approved January 11, 2004, revealed to Plaintiff in January 2004 that his Base Pay was limited to the $102,300 figure, but Plaintiff was also eligible for a lump sum group cash award that did not increase his base pay. See Exhibit 14 at 1-3.

25. Thus, by January 2004, Plaintiff had received actual notice regarding the consequences of the core compensation policies on his pay and benefits. Id.

26. Adjustments were also approved for Plaintiff on May 24, 2004, but again Plaintiff waited beyond 45 days to seek

-5-

Equal Employment Office ("EEO") counseling. <u>See</u> Exhibit 14 at 4-6; Exhibit 3 at 2.

27. In fact, Plaintiff did not contact an EEO Counselor about his individual complaint of age discrimination until August 10, 2004. Exhibit 3 at 2.

28. Plaintiff does not allege and the Agency is unaware of any evidence that Plaintiff provided notice, by February 12, 2004, to the EEOC of any intent to file an ADEA complaint directly in district court. <u>See</u> Complaint, ¶¶ 7-9.


                              Respectfully submitted,


                              _____
                              KENNETH L. WAINSTEIN, DC Bar #451058
                              United States Attorney


                              _____
                              R. CRAIG LAWRENCE, DC Bar #171538
                              Assistant United States Attorney


                              _____
                              W. MARK NEBEKER, DC Bar #396739
                              Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment, supporting memorandum, statement of material facts, attachments and a proposed order has been made through the Court's electronic transmission facilities on this 10th day of November, 2005.

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC  20530
(202) 514-7230