UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALACHY COGHLAN,                    )
                                    )
              Plaintiff,            )
                                    )
       v.                           )  Civil Action No. 05-1476 PLF
                                    )
NORMAN Y. MINETA,                   )
U.S. Department of Transportation,)
                                    )
              Defendant.            )
_____)

DEFENDANT'S RENEWED MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, by and through undersigned counsel, hereby

moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)

(1) and (6).  In the alternative, Defendant submits that summary

judgment is appropriate pursuant to Fed. R. Civ. P. 56, because

there are no material facts in dispute and Defendant is entitled

to judgment as a matter of law.  In support of this Motion,

Defendant respectfully refers the Court to the accompanying

Memorandum Of Points And Authorities In Support Of Defendant's
Renewed Motion To Dismiss Or, In The Alternative, For Summary
Judgment, statement of material facts and proposed Order.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney


_____
R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney


_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

OF COUNSEL:

JULIA RHODES, ESQ.
Personnel & Labor Law Staff (AGC-30)
The Office of the Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W., 1st Floor
Washington, DC  20591

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MALACHY COGHLAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1476 PLF |
| | ) |
| NORMAN Y. MINETA, | ) |
| U.S. Department of Transportation, | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S RENEWED MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I. <u>INTRODUCTION</u>

Plaintiffs, employees of the Federal Aviation Administration ("FAA" or "Agency"), <u>see</u> Amended Complaint, ¶ 1, allege that the Agency has engaged in age discrimination under theories of both disparate treatment and disparate impact.  Specifically, they allege that the policies under the FAA's Core Compensation System, which mandate that any annual increases awarded to employees at the top of their pay band generally be awarded as lump sum payments, discriminate against older workers.  A review of the facts reveals procedural and substantive infirmities with the Amended Complaint that are fatal.  Thus, Defendant seeks dismissal or summary judgment in favor of Defendant.

II.   <u>PROCEDURAL HISTORY</u>

<u>A. Plaintiff Coghlan</u>

Plaintiff Coghlan admits his salary reached the pay band maximum[1] in January 2004.  <u>See</u> Amended Complaint, ¶¶ 2-3, 8.  Not until August 10, 2004, however, did Plaintiff Coghlan contact an EEO Counselor alleging that he had been subjected to disparate treatment by the FAA had discriminated against him based on his age.  <u>See</u> Exhibit 3 (EEO Counselor's Report); Amended Complaint, ¶ 3.  When the parties were not able to resolve the matter, Plaintiff Coghlan received a notice of final interview on September 9, 2004.  Exhibit 3 (EEO Counselor's Report).

In his EEO Complaint, dated September 27, 2004, Plaintiff Coghlan alleged, in part, that the FAA's Core Compensation System resulted in disparate treatment.  <u>See</u> Exhibit 4 (Formal Complaint).  Specifically, Plaintiff Coghlan challenged the policy that requires Organizational Success Increase ("OSI") and Superior Contribution Increase ("SCI") awards not be pay adjustments that increase the base salary if an employee is at the maximum of his pay band.  <u>Id</u>.  Plaintiff Coghlan claimed to be a member of a group of approximately 829 employees who were

--------

[1]  An explanation of what a pay band maximum is contained below. <u>See</u> <u>also</u> Exhibit 1, ¶ 4; Exhibit 2; Exhibit 17, ¶¶ 4-11. Exhibits 1 through 14 were filed on November 10, 2005 with Defendant's Motion To Dismiss Or, In The Alternative, For Summary Judgment.

treated differently than 4,158 other employees in the Core
Compensation System who are receiving adjustments to their base
pay even though they are at the pay band maximum.  He also
alleged that the policy has a disparate impact based on age.  Id.
He further alleged, without any elaboration, that the difference
in treatment between the two groups of employees is a violation
of equal pay for equal work principles.  He repeatedly asserted
that the alleged selective application of the policy and the fact
that the policy allegedly was not being applied to all employees
was unfair.  However, Plaintiff Coghlan never raised an
allegation of wage discrimination or that the application of the
policy negatively impacted each paycheck.  As relief, Plaintiff
Coghlan sought the following:

> a.   correction of base pay for the last two years
> to reflect an actual base pay increase;
> b.   correction of last two years pay for night,
> Sunday, holiday and overtime differentials; and
> c.   payment of lost TSP contributions during last
> two years due to the reduced base pay.

Id.  By decision dated December 13, 2004, the Departmental Office
of Civil Rights ("DOCR") for the Department of Transportation
("DOT") dismissed the EEO complaint pursuant to 29 C.F.R. §
1614.107(a)(1) due to the Plaintiff Coghlan's failure to state a
claim,[2] and also pursuant to 29 C.F.R. § 1614.107(a)(2) as

---

[2]  The DOCR found that Plaintiff had alleged a generalized
grievance since the policy or practice which he was attacking was

untimely.  <u>See</u> Exhibit 5 (Final Agency Decision); Amended

Complaint, ¶¶ 7-9.  The DOCR also found that the EEO complaint

was subject to dismissal pursuant to 29 C.F.R. § 1614.107(a)(2),

because Plaintiff Coghlan did not contact an EEO Counselor until

approximately four years after the permanent implementation of

the compensation system in 2000 and beyond 45 days after

receiving OSI and SCI lump sum payments that were not reflected

in his base pay.  <u>Id</u>.

Plaintiff Coghlan filed an appeal dated January 12, 2005,

which was received by the Agency on January 25, 2005.  <u>See</u>

Exhibit 6 (Plaintiff's Appeal).[3]  The EEOC affirmed the Agency's

decision on March 11, 2005.  Specifically the EEOC concluded that

Mr. Coghlan knew or should have known about discrimination with

regard to receipt of a lump-sum one-time payment on January 11,

2004.  <u>See</u> <u>Coghlan v. Mineta</u>, 2005 WL 636384, EEOC Appeal No.

---

applied to all FAA employees who are covered by the Core
Compensation System regardless of age.  <u>See</u> <u>id</u>.

[3]  Plaintiff did not file a brief in support of his appeal, but
in a cover letter alleged that it was error for the Agency not to
address his claim of a continuing violation.  <u>Id</u>.  He did not
however alleged that the Agency had misstated or identified his
claim, which DOCR had identified as "were you discriminated
against based on your age . . . when the FAA implemented the Core
Compensation System in 1998 that limited all employees at the
maximum of their pay band to receive all future Organization
Success Increase and Superior Contribution Increase awards as
lump sum payment and you became aware of the impact to you on
June 28, 2004?"  Exhibit 5 at 1.

-4-

01A52152 (Mar. 11, 2005). Plaintiff Coghlan filed a request for reconsideration, but in a decision dated April 27, 2005, the EEOC affirmed the dismissal of Plaintiff's claims. Coghlan v. Mineta, 2005 WL 1073773, EEOC Appeal No. 01A52152 (Apr. 27, 2005). Additionally, the EEOC held that it was not persuaded by the Plaintiff Coghlan's continuing violation claim nor his claim that each paycheck received was a separate actionable claim. Instead, the EEOC held that the discriminatory act at issue was the receipt of a lump sum award in lieu of a salary increase and Plaintiff Coghlan failed to present any persuasive argument to demonstrate why the time period in which he was required to contact an EEO Counselor should have been tolled.

On July 27, 2005, the Plaintiff Coghlan filed the present action.

B.  Plaintiffs O'Hara and Coghlan

On February 23, 2005 Plaintiff O'Hara contacted an EEO Counselor. Exhibit 18 at 2 (EEO counselor's report). Plaintiff O'Hara alleged that on or about January 14, 2005, the FAA Administrator allegedly decided to deny him a raise/within-grade increase/step increase/annual COLA locality pay increase. Plaintiff O'Hara claimed that the Administrator's alleged decision was evidence of a continuing pattern and practice of pay discrimination and a violation of equal pay and merit principles.

-5-

He further alleged that the Administrator's decision had a discriminatory impact on him and other employees over the age of 40, because similarly situated employees had received increases to their base pay.  <u>See</u> Exhibit 19  (EEO Class Complaint).  When the informal complaint was not resolved, Plaintiff O'Hara filed a formal EEO complaint along with Plaintiff Coghlan.  <u>See</u> Amended Complaint, ¶ 11; Exhibit 19.

In their formal complaints, Plaintiffs alleged age discrimination from January 14, 2005 and continuing.  <u>See</u> Exhibit 19 at 2.  Specifically, Plaintiffs alleged that they were filing the complaint on behalf of themselves as well as "all current and/or former employees of the FAA Nationwide in the C-K pay bands who have been denied raises (also known as "Organizational Success Increases" and/or "Superior Contribution" Increases") at any time since January 14, 2005, and continuing thereafter, and/or whose retirement annuity has or will be adversely affected by such refusals.  As relief, they sought retroactive back pay for up to three years prior to the filing of this administrative class complaint as well as actual and compensatory damages, liquidated damages, injunctive relief and attorney's fees.

This administrative class complaint was withdrawn shortly after the instant Amended Complaint was filed.

-6-

III.  FACTUAL BACKGROUND

A.  FAA's Core Compensation Pay System

Pursuant to 49 U.S.C. § 40122 (g)(1), the FAA Administrator was authorized to create a personnel management system that addressed the unique demands on the Agency's workforce, including greater flexibility in the compensation of personnel.  See Exhibit 1 (Declaration of Christopher K. Early).  In response to this mandate, the Agency convened a Compensation Committee.  Id. The committee created, in relevant part, the Core Compensation Pay System, which was made available to employees in September 1999.  Id., ¶ 2.

A key part of the system is that all employees were to be converted from the General Schedule ("GS") to pay bands.  Id., ¶ 3.  The structure of each pay band is similar to the GS system in that there are minimums and maximums assigned to each pay band. Id.; see also Exhibit 2.  The salary ranges for positions in the core compensation system, as in the GS system, are based upon the relative value of the work performed by each position.  See Exhibit 1, ¶ 3.  However, in contrast to the GS system, where changes within grades are somewhat automatic and are primarily driven by continued service, a key feature of the FAA's core compensation system is that movement within the pay band is primarily driven by organizational and individual performance

-7-

that correlate to the OSI and SCI pay adjustments.  Id.  Another distinct feature of the new core compensation system, which was widely publicized, is that the FAA Administrator has the flexibility to increase or decrease the maximum pay range for positions, rather than having the maximum pay range for the pay bands automatically increase based upon the percentage of the raise and cost of living award received by federal employees. Id.; see also Exhibit 2 (Table showing Core Compensation Plan Pay Bands).

Effective on March 12, 2002, Section COMP-2.21C of the Human Resources Policy Manual ("HRPM") announced the consequence of an employee reaching a pay band maximum upon being converted into the core compensation system.  See Exhibit 1, ¶ 6; Exhibit 7 (Comp-2.21C: Grandfathered employees in the core compensation plan of the HRPM).  Essentially, those employees whose salaries immediately exceeded the pay band upon conversion[4] became covered by a "grandfather provision" which allowed them to receive OSI and SCI pay adjustments as increases to their base pay.  See

---

[4]  The date of conversion was not the same for all FAA employees. While all non-bargaining unit employees were converted on April 23, 2000, the conversion for some bargaining unit employees occurred later and depended on when the FAA and the relevant union reached agreement.

-8-

Exhibit 1, ¶ 4.[5]  This Section only applied to the position that
an employee held at the time of conversion, so if an employee
voluntarily moved to another position or the salary for the
position fell within the pay range for his or her assigned pay
band, then the employee would no longer be covered by the
"grandfather provision."  Id.; see also Exhibit 1, ¶ 4.

        In contrast, all employees whose salaries after the initial
conversion exceeded the maximum of the pay band were to receive
any pay adjustments as lump sum payments.  See Exhibit 9 (HRPM,
COMP-2.4C: Annual Pay Adjustments).  The annual OSI and SCI
disbursements are made in January or early February of each year.
Id.

        On a yearly basis the FAA Administrator and Compensation
Committee review such things as a market survey, which includes

---

[5]  There are exceptions to these rules beyond that pool of
individuals who were grandfathered.  See Exhibit 8.  In July of
2004, there were 4158 bargaining unit employees who exceeded the
maximum of their pay bands, but still received any annual pay
adjustments as increases to their base pay.  Id.  Of this group
of employees, 95.2% were 40 years of age or older.  Exhibit 1, ¶
9.
        These exceptions to Section Comp-2.21C were made pursuant to
the National Air Traffic Controllers Association ("NATCA")
contract for Engineers and the Professional Airway Systems
Specialist ("PASS") contract for technicians.  Each of these
contracts contains articles specifying that employees in
positions covered by the collective bargaining agreements will
receive any annual pay adjustments as increases to their "basic
pay."  Id.  In others words, due to collective bargaining
agreements, there are employees currently not subject to Chapter
Comp-2.4C of the HRPM.  Id.

the aviation and aerospace industries as well as incorporates
market data from thousands of other areas, to get a comprehensive
picture of the community's salary situation.  See Exhibit G, ¶ 7;
see also Exhibit 10 (HRPM, COMP-2.2C: Pay Bands in Core
Compensation System).  This review allows the FAA to determine
whether its salaries are competitive and should remain unchanged
or are not competitive and should be changed.  See Exhibit 1, ¶
7; Exhibit 11 (2004 Summary of Market Survey).

As a result of the annual review process, the pay bands were
increased in 2001 and 2002.  See Exhibit 12 (Administrator's
Announcements from 2000 through the present).  However, based on
the market surveys, the Administrator did not increase the pay
bands in 2003, 2004, or 2005.[6]  Id.  In fact, all employees were
notified, through briefings and broadcast messages as well as
through the policy website, of the manner in which pay bands
would be adjusted and of the consequences of reaching the pay
band maximum for a position.  See Exhibit 13.  Additionally, by
January 2003, this message was reaffirmed when all FAA employees
were notified through a broadcast message from the Administrator
that the pay band for 2003 would not be changed.  See Exhibit 1,
¶ 7.  The FAA Administrator's broadcast message merely reiterated

---

[6]  It should be noted that on January 5, 2006, the FAA
Administrator announced a  2.1% increase in the maximum levels of
pay for all pay bands.  See Exhibit 15.

pay policies about which employees had previously been notified. <u>Id</u>.

Briefings about the elements of the Core Compensation Pay system were given to all FAA employees. <u>See</u> Exhibit 1, ¶¶ 5-6. In addition, pamphlets containing information about elements of the plan, including Chapters Comp-2.4C and 2.21C, were given to all employees and the information was also available through a website dedicated to communicating details about the plan. <u>See</u> Exhibit 1, ¶¶ 5-6. In this context, Plaintiffs received one or more Standard Form 50s ("SF-50") reflecting that their salary was at the pay band maximum for each of their positions and also indicating that they were receiving a lump sum payment. <u>See</u> Exhibit 14 (Coghlan SF-50s) and Exhibit 16 (O'Hara SF-50s). At the time that the Amended Complaint was filed, Plaintiffs were in

Pay Band J, which had a maximum base pay figure of $102,300.00.[7] See Exhibit 2 at 1; Exhibit 14; Exhibit 16 at 7.[8]

By December 31, 2001, Plaintiff O'Hara reached the Pay Band maximum for his position.  As a result, for all pay adjustments received between 2001 and 2005, he received lump sum payments for each pay adjustment.  Id.  Similarly,  Plaintiff Coghlan's SF-50s approved on January 11, 2004 revealed that his Base Pay was limited to the $102,300 figure, but he also received a lump sum group cash award that did not increase his base pay.  See Exhibit 14 at 1-3.  Thus, Plaintiff Coghlan and Plaintiff O'Hara were given further actual notice, January 2004 and December 2001, respectively, regarding the consequences of the core compensation policies discussed above.  Id.; see Exhibit 1, ¶¶ 2-7.

---

[7]  If Plaintiffs had remained under the GS system (excluding locality pay) their current base salaries would be $101,130, i.e. lower.  Declaration of Christopher K. Early (Exhibit 17), ¶ 13. Thus, if Plaintiffs' theory is that the Core Compensation System has had an adverse effect on the base pay of older employees, Plaintiff's Coghlan and O'Hara do not have standing to complain. See Arizonans For Official English v. Arizona, 520 U.S. 43, 64-65 (1997); City of Houston, v. Department of Housing and Urban Development, 24 F.3d 1421, 1429 n. 6 (D.C. Cir. 1994) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.") (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

[8]  Adjustments were also approved on May 24, 2004, but again more than 45 days elapsed before EEO counseling took place.  See Exhibit 14 at 4-6; Exhibit 3 at 2.

B.  Background on the Employees' Concerns

Prior to the filing of the instant action, another FAA employee, Mark Lash, raised the concern that the FAA Administrator's failure to increase the pay band maximums was negatively affecting the more senior and experienced employees in the workforce who were 40 years old or older.[9]  Mr. Lash raised his concerns about the FAA's pay policy with representatives in Congress; Stephen Barr of the Washington Post; the Federal Times; the FAA Administrator and other senior FAA executives; and approximately 829 FAA employees who in 2004 were at the pay band maximum and were receiving annual pay adjustments as lump sum payments.  See, e.g., Exhibit 20 (experpts of e-mails). In fact, in repeated electronic message (e-mail) transmissions, Mr. Lash encouraged, all 829 employees to file individual complaints of discrimination until further investigation and consultation could occur in the effort to obtain legal representation for a class action.  On January 12, 2005,  Mr. Lash passed the torch for corresponding with potential class members via electronic mail as well as with FAA management regarding the contention that the pay policy was discriminatory.  Exhibit 20 (Lash 6/27/04 e-mail)

---

[9]  The average age of the FAA's workforce is 49 years old and the average age of those receiving annual pay adjustments as lump sum payments because they are at their pay band maximum is 53 years old, a difference of only 4 years.  Exhibit 17, ¶ 15.

-13-

Plaintiff O'Hara then undertook to send such e-mails.  Exhibit 21 (Lash/O'Hara 1/12/05 e-mail).

It was in the wake of this call to action that Plaintiff Coghlan filed his individual complaint of discrimination.  In other words, well before filing any complaint, the Plaintiffs and other employees had actual notice of the FAA's compensation policy regarding the award of annual pay increases and an awareness that this policy allegedly had class-wide discriminatory implications.  Yet, when Plaintiff Coghlan filed his individual complaint of discrimination in August of 2004, he did not advise the EEO Counselor that he sought to represent a class of similarly situated employees nor did he explicitly or expressly allege pay or wage discrimination with regard to the receipt of each pay check.  See Exhibit 4.  In contrast, as Plaintiffs admit in the Amended Complaint, Mr. Coghlan later sought to be a class agent with regard to the annual pay adjustments made in 2005 to the present.  See Amended Complaint, ¶ 11.  In light of his later conduct, Plaintiffs have clearly understood the difference between an individual and class complaint as well as the manner in which to prosecute both types of complaint.

C.  Plaintiff Coghlan Affected by the Core Compensation System

On January 11, 2004, Plaintiff Coghlan received a portion of his annual pay adjustment as an increase to his base pay, which rose to the pay band maximum and the remainder of his annual pay adjustment as a lump sum award.  See Exhibit 2 at 1; Exhibit 14. In other words, by the very receipt of the lump sum, Section 2.4C was applied to Plaintiff Coghlan and he felt its effect by January 11, 2004.  Id.  Similarly, by December 31, 2001, Plaintiff O'Hara received a lump sum payment and felt the effect of Section 2.4C.  Plaintiff Coghlan did not contact an EEO Counselor about his individual complaint of age discrimination until August 10, 2004.  Exhibit 3 at 2.[10]  Plaintiffs did not file an administrative class complaint until March 23, 2005, which is 14 months after Plaintiff Coghlan received his first lump sum payment and 32 months after Plaintiff O'Hara began receiving lump sum payments.

---

[10]  The Agency is unaware of any evidence that Plaintiff provided notice, by February 12, 2004, to the EEOC of any intent to file an ADEA complaint directly in district court.  Nor does Plaintiff allege having done so.  See Complaint, ¶¶ 7-9 (describing Plaintiff's efforts to exhaust administrative remedies, which include no allegations that Plaintiff filed any notice of intent to sue with the EEOC).

IV.  ARGUMENT

A.  Failure timely to exhaust administrative remedies.

Under the Age Discrimination in Employment Act ("ADEA"), a federal employee may bring a claim of age discrimination directly to federal court if he gives at least 30 days notice to the EEOC of his intent to sue and he files this notice within 180 days after the alleged discriminatory conduct.  See 29 U.S.C. § 633a(d); Rann v. Chao, 209 F. Supp. 2d 75, 78-79 (D.D.C. 2002); aff'd 346 F.3d 192 (D.C. Cir. 2003); cert. denied, 125 S.Ct. 35 (2004).  Alternatively, an employee may elect to pursue claims administratively.  If the employee is dissatisfied with the result of the administrative proceedings, he may file suit in federal court once he has fully exhausted his administrative remedies.  See 29 U.S.C. § 633a(b); Stevens v. Dep't. of Treasury, 500 U.S. 1, 5-6 (1991) (describing the two routes by which a federal employee may bring an ADEA claim to federal court).  These time limits in the ADEA operate like statutes of limitations, and exhaustion of administrative remedies is considered a prerequisite to bringing a federal action.  See Brown v. GSA, 425 U.S. 820, 829-33 (1976); Washington v. Washington Metropolitan Area Transit Authority, 160 F.3d 750, 752 (D.C. Cir. 1999); Bayer v. Dep't of Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992).  Therefore, if a plaintiff has not met the

-16-

filing requirements under the statutes, his federal court action is not timely. See Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) ("[T]he plaintiff who fails to comply, to the letter, with administrative deadlines 'ordinarily will be denied a judicial audience.' ") (citation omitted).

> An employee complaining of discrimination must consult an Equal Employment Opportunity (EEO) counselor within 45 days of the date of the allegedly discriminatory action in order to try to informally resolve the matter. See 29 C.F.R. § 1614.105(a)(1). As a general rule, discrimination claims alleging conduct that occurred more than 45 days prior to the initiation of administrative action are time-barred in a subsequent action. See Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir.2001); Valentino v. United States Postal Serv., 674 F.2d 56, 65 (D.C. Cir. 1982).

Velikonja v. Ashcroft, 355 F.Supp.2d 197, 204 (D.D.C. 2005). Here, claims in Amended Complaint should be dismissed for failure timely to exhaust administrative remedies.

> 1.    The claims regarding the 2004 pay adjustments must be dismissed due to the Plaintiffs' failure to exhaust age discrimination allegations concerning the application of the Core Compensation policy

As previously stated, time limits in the ADEA operate like statutes of limitations, and exhaustion of administrative remedies is considered a prerequisite to bringing a federal action. See Brown v. GSA, 425 U.S. at 829-33. A review of the administrative record regarding Plaintiff Coghlan's complaint reveals that DOCR identified the issue that EEOC reviewed as

"were you discriminated against when the FAA implemented the Core Compensation System in 1998 that limited all employees at the maximum of their pay band to receive all future OSI and SCI awards as lump sum payment."  Exhibit 5 at 1.  In other words, a review of the text of DOCR's decision letter as well as EEOC's decisions demonstrates that the manner in which the administrative issue was framed, and which Plaintiff Coghlan never challenged as being incorrect, was receipt of a lump sum payment based on the implementation of the Core Compensation System.  In contrast, this Amended Complaint specifically states that the issue is pay discrimination based on age discrimination with respect to each receipt of each paycheck.  Amended Complaint, ¶ 3.  Since this was not the issue that Plaintiff Coghlan pursued as evidenced by the DOCR and EEOC decision, he has failed to exhaust his claim with regard to allegations of discrimination based on receipt of each pay check in 2004.

> 2.    The Claims Concerning 2004 must be dismissed due to Plaintiffs' failure timely to contact an EEO Counselor regarding class wide allegations of age discrimination.

As Plaintiff Coghlan admits, he elected to pursue his individual age discrimination complaint through the administrative EEO process.  Amended Complaint, ¶¶ 7-9.  Yet, he did not seek to represent a class based on his discrimination

-18-

allegations when he contacted an EEO Counselor on August 10, 2004. Rather, Plaintiff Coghlan made a vague statement that he "learned about the disparate treatment for those over 40 on June 28, 2004. [He] hit the maximum of his pay band in January 2004. He received OSI/SCI's as a partial lump sum payment with the remainder being added to base pay." Exhibit 3 at 2. Plaintiff Coghlan, although demonstrating how to distinguish an individual complaint from a class complaint, see Amended Complaint, ¶¶ 7, 11, did not pursue class claims when he contacted an EEO Counselor regarding the pay awards in 2004. See Amended Complaint, ¶ 7; Exhibit 3; Exhibit 4. Moreover, Plaintiff O'Hara never filed an administrative complaint containing allegations of class-wide age discrimination based on pay awards in 2004. Therefore, Plaintiffs have failed to exhaust administrative remedies with regard to a class-wide claim of age discrimination in 2004. See Artis v. Greenspan, 158 F.3d 1301 (D.C. Cir. 1998)(holding that a failure to present class-wide claims during EEO Counseling was a failure to exhaust administrative remedies thereby depriving the court of jurisdiction).

3.   Mr. Coghlan's individual claim was untimely.

Even assuming that Plaintiff Coghlan's contact with an EEO Counselor regarding his individual complaint of age

-19-

discrimination were sufficient to raise class-wide allegations, the complaint must still be dismissed due to his untimely contact with an EEO Counselor regarding any allegations of age discrimination related to the FAA's Core Compensation System. EEOC regulations require that an aggrieved person must contact a Counselor within 45 days of the "matter alleged to be discriminatory."  29 C.F.R. § 1614.105(a)(1).

As discussed above, the issue that was raised and reviewed administratively -- the definition of which went uncontested -- concerned the receipt of a lump sump payment of OSI and SCI awards based on the implementation of the Core Compensation System.  Exhibit 5 at 1.  As a result, since the practice of awarding lump sum payments is the practice that is alleged to be discriminatory, then the triggering event for the 45-day period for EEO contact begins when the injury accrues, _i.e._, when the individual knew or through the exercise of reasonable diligence should have known of the discriminatory nature of the practice. See, e.g., Delaware State College v. Ricks, 449 U.S. 250, 257 (1980)(finding that injury occurred when notified of denial of tenure decision and not when actually terminated); Schrader v. Tomlinson, 311 F. Supp.2d. 21, 27 (D.D.C. 2004)(citations omitted) (holding that a plaintiff "may not rely on the continuing violation theory where [he] was aware of the

-20-

discriminatory conduct at the time it occurred."); Kilpatrick v. Riley, 98 F. Supp.2d. 9, 18 (D.D.C. 2000) (holding that continuing violation theory did not apply to plaintiff's discrimination claim, which occurred in 1980, where plaintiff filed an EEO complaint in 1991 and, according to plaintiff's own factual account, by 1980 he already believed that his employer systematically discriminated); Rendon v. District of Columbia, 1986 WL 15446, *3  (D.D.C. Nov. 19, 1986) (holding that plaintiff's claims of race discrimination that she knew or had reason to know about and that were not timely filed with the EEOC were barred from consideration by the Court); Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267 (7th Cir. 1995)(finding that Thelen discovered the injury when informed of his discharge and not when he learned who was hired to replace him); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386-87 (3rd Cir. 1994)(finding that Oshiver discovered the injury when informed of her discharge and not when she learned who was hired to replace her).  Plaintiff's theory that he will suffer some harm through reduced retirement does not save his otherwise untimely claim. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Florida v. Long, 487 U.S. 223, 239 (1988).  Thus, for the reasons described in greater detail below, regardless of whether the claim is treated as a personnel action or a matter alleged to

be discriminatory, these claims must be dismissed due to the failure to contact an EEO counselor within 45 days.

Eligible FAA employees received OSI/SCI awards in January of 2004. The Plaintiffs acknowledge receiving his 2004 OSI/SCI award as a partial lump sum payment, i.e. without any corresponding increase in his base pay in January 2004. See Amended Complaint, ¶¶ 8, 10. Yet, the earliest contact with an EEO Counselor was not until August 10, 2004, see Exhibit 3 at 2; see also Exhibit 18 at 2; this was well beyond the 45 day period. See Scarborough, 190 F. Supp. 2d at 15; 29 C.F.R. § 1614.105(a)(1). The Plaintiffs have failed to allege or proffer any evidence warranting equitable tolling of this deadline. Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (untimely exhaustion of administrative remedies is a defense); see Bayer v. United States Dep't. of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992)(the plaintiff bears the burden of pleading and proving equitable reasons for his or her failure to comply with the 45-day time limit).

Moreover, as Plaintiff Coghlan states in his formal EEO complaint, for two years prior to filing his complaint he and others suffered from the alleged discriminatory practice of awarding annual pay adjustments only as lump sum payments to employees at the maximum of their pay bands. See Exhibit 4 at 2.

Given the admitted awareness of the alleged offending conduct, it is well established that a continuation violation does not apply to the discrimination claim at issue.  See Kilpatrick, 98 F. Supp.2d. at 18.

Throughout the Amended Complaint, Plaintiffs reference an allegedly discriminatory practice under the Core Compensation System of allegedly "failing to provide annual increases in base salary and paying discretionary cash awards that are not included in the base salary or in the computation of class members' retirement benefits, constitute[ing] discrimination on the basis of age," but they do not reference receipt of a lump sum payment which was the source of the administrative complaint.  See, e.g. Amended Complaint, ¶¶ 25, 29-30.  All FAA employees were notified, well before April 2000, and no later than March 12, 2002, of the consequences of their salaries reaching the pay band maximum, i.e., that they would receive any annual pay adjustment as a lump sum payment.  Exhibit 1, ¶¶ 2-6.  Plaintiff Coghlan reached his pay band maximum by January 2004.  See Complaint, ¶ 7-8, 10-11.  Yet, Plaintiff Coghlan did not contact an EEO Counselor until August 10, 2004.  In light of these events, Plaintiff Coghlan, who is himself a lawyer, see Amended Complaint, ¶ 20, failed to contact an EEO Counselor in a timely manner.  He knew, or should have known, about the practice that

-23-

he now seeks to challenge, i.e., the implementation of Comp-2.4C,
but waited too long to assert his rights.  Indeed, he waited
until 2 years after the practice was implemented and
approximately 6 months after being advised that his own base pay
would not be increased in the amount of his lump sum payment.[11]
Any claims regarding the creation of the pay policy were, thus,
not timely exhausted.  Additionally, any claims relating to the
receipt of a lump sum payment in 2004 are untimely.

> B.  Plaintiffs' disparate impact claims must be
> dismissed for failure to state a claim and lack of
> jurisdiction given the lack of any waiver of sovereign
> immunity for such a claim.

In Smith v. City of Jackson, 125 S. Ct. 1536 (2005), the
Supreme Court analyzed the validity of private-sector[12] age

---

[11]  Arguably, to the extent that Plaintiff Coughlan sought to
challenge the creation of the policy, he should have sought EEO
counseling 45 days after learning of the Agency's adoption of the
offending provision.  See Harris v. Federal Aviation
Administration, 215 F. Supp. 2d. 209 (D.D.C. 2002) (holding that
an agency action that merely reiterates or affirms an earlier
agency decision does not trigger the statute of limitations under
the Administrative Procedures Act), aff'd, 353 F.3d 1006 (D.C.
Cir.), cert. denied, 125 S.Ct. 34 (2004); see also Village of
Bensenville v. Federal Aviation Administration, 376 F.3d 1114,
1119-20 (D.C. Cir. 2004).  The Court need not address this issue,
however, because Plaintiff Coughlan was not timely even if the
45-day period is calculated from the later date, when he learned
that his base pay would not be increased in the amount of his
lump sum award in January 2004, or even from the second time that
he received such a lump sum award under the policy, in May 2004.
See Exhibit 14.

[12]  The ADEA's federal-sector provisions are separate from the
private-sector provisions and are intended to be interpreted

-24-

discrimination disparate impact cases.  There, the Court began
with a review of the statutory language.  Section 4(a)(2) of the
ADEA of 1967, which was codified as 29 U.S.C. § 623(a)(2),
provides that it shall be unlawful for an employer "to limit,
segregate, or classify his employees in any way which would
deprive or tend to deprive any individual of employment
opportunities or otherwise adversely affect his status as an
employee, because of such individual's age . . . ."   This
language is virtually identical to Section 703(a)(2) of the Civil
Rights Act of 1964 (Title VII), except for the inclusion of age
as the basis of discrimination.  In light of the fact that
Congress used the same language in two statutes having similar
purposes, the Court affirmed the principle that "it is
appropriate to presume that Congress intended that text to have
the same meaning in both statutes." Smith, 125 S.Ct. at 1541
(citing Northcross v. Board of Ed. Of Memphis City Schools, 412
U.S. 427, 428 (1973)(per curiam)).  Therefore, the Court examined
how Section 703(a)(2) had been interpreted, including Griggs v.
Duke Power Co., 401 U.S. 424 (1971).

      In Griggs, an employer imposed an education or testing

---

independently.  See 29 U.S.C. § 633a(f) (2000) (stating that none
of the non-federal portions of the ADEA applies to federal
employers); see also Lehman v. Nakshian, 453 U.S. 156, 168 (1981)
(noting that the federal provisions of the ADEA are "unaffected
by other sections").

requirement as a condition of employment or transfer.  The record revealed that these qualification standards, which were not related to performance, served to disqualify African-American applicants at a higher rate than white applicants.   The Supreme Court interpreted Section 703(a)(2) as addressing the consequences or effects of policies or practices.  As a result, the Court determined that the private sector employees were able to advance a disparate impact theory of discrimination regarding the employer's facially neutral policy.  Based on this precedent and the similarity in the statutory language, the Court in Smith determined that Section 623(a)(2) authorized the prosecution of an adverse impact complaint based on age in a case involving the private sector.  The Smith decision does not discuss, analyze, or address Section 633a of the ADEA, which prohibits age discrimination in federal employment.  Smith, 125 S. Ct. at 1536.

Accordingly, with respect to Section 633a, a determination as to the viability of disparate impact claims must begin with an examination of the statutory language.  It is well established that "[s]tatutory construction" must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Engine Mfrs. Ass'n v. South Coast Air Quality, 541 U.S. 245, 252-53 (2004)(quoting Park 'N Fly, Inc. v. Dollar Park & Fly, 469

U.S. 189, 194 (1985)).  In addition, it is a general principle of statutory construction that "when Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion."  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 453 (2002)(quoting Russello v. United States, 464 U.S. 16, 23 (1983)).  See also United States v. Bean, 537 U.S. 71, 76 (2002)(citing N.Singer, *Sutherland on Statutes and Statutory Construction* § 46:06, p. 194 (6th ed. 2000), for the proposition that the use of different terms within related statutes generally implies that different meanings were intended).  Accordingly, courts must presume that a legislature says in a statue what it means and means in a statute what it says.  Barnhart, 534 U.S. at 450.[13]  In addition, where "the statutory language used is unambiguous, the [judicial] inquiry ceases." Id., at 454 (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)); Whitfield v. United States, 125 S. Ct. 687, 692 (2005).

Moreover, Section 633a serves only as a limited waiver of the federal government's sovereign immunity.  As a result, it

---

[13]  The Court also concluded that, even if a court decides to examine the legislative history of an unambiguous statute, floor statements from members of Congress cannot amend clear and unambiguous language of a statute.  Barnhart, 534 U.S. at 457.

must be strictly construed in favor of the United States, see
Lane v. Peña, 518 U.S. 187, 192 (1996); Settles v. U.S. Parole
Comm'n, No. 03-5368 slip op. at 12 (D.C. Cir. Nov. 8, 2005), and
the terms of that waiver "must not be enlarged beyond such
boundaries as the statute's language plainly requires," Nowd v.
Rubin, 76 F.3d 25, 27 (1st Cir. 1996) (internal quotation
omitted) (holding that Section 633a does not authorize award of
attorney's fees); Villescas v. Abraham, 311 F.3d 1253, 1259 (10th
Cir. 2002) (Section 633a does not waive immunity from damages for
emotional distress in retaliation claim); Lehman v. Nakshian, 453
U.S. 156, 168-69 (1981)(holding that Section 633a did not
entitled federal employees to a jury trial); Laird v. Nelms, 406
U.S. 797 (1972)(holding that, although the Federal Tort Claims
Act made the United States liable for the "negligent or wrongful
act or omission of any employee of the Government ..., if a
private person, would be liable to the claimant," 28 U.S.C. §
1346(b), the United States nonetheless was not liable for the
entire range of conduct classified as tortuous under state law).
Section 633a pertains to "all personnel actions affecting
employee or applicants . . . who are at least 40 years of age."
29 U.S.C. § 633a.  Nothing in this language plainly establishes
that disparate impact claims are viable against a federal
employer.  Section 633a, unlike Section 623(a)(2) of the ADEA and

-28-

Section 703(a)(2) of Title VII, makes no reference to practices,

classification, or segregation, and it makes no reference to

disparate impact.  Thus, the language of the statute itself

demonstrates that the scope of the actions covered by 633a are

personal in nature and relate more naturally to claims of

disparate treatment based on intentional action as opposed to

broad neutral policies that later turn out to have an impact on a

group of employees over the age of 40.[14]  The fact that Congress

did not include language authorizing federal-sector suits based

on disparate impact claims is significant and shows no clear

intent that disparate impact claims under the ADEA are actionable

against the federal government.  See Ellis v. United Airlines,

Inc., 73 F.3d 999, 1008 (10th Cir. 1996).  Thus, since a clear

waiver of sovereign immunity has not been provided for under

─────────────────

[14]  If Congress had intended to authorize federal employees to
file disparate impact claims based on age, it could easily have
added a provision in Section 633(a) that mirrored either Section
623(a)(2) of the ADEA or Section 703(a)(2) of Title VII, codified
as 42 U.S.C. § 2000e-2(k).  Instead, Congress took the opposite
tack and specifically separated the federal- and private-sector
provisions.  See 29 U.S.C. § 622(f).  And, although Congress
amended Title VII to include disparate impact claims in 1991, see
Pub. L. 102-166, §105 (adding sub-part (k) to 42 U.S.C. § 2000e-
2), Congress did not take a similar action with regard to Section
633a of the ADEA, although it amended Section 633a both in 1995
and 1998. See Pub. L. 104-1, § 201(c)(2) (Jan. 23, 1995)
(inserting provisions relating to Government Printing Office and
General Accounting Office and struck out provisions relating to
legislative branch.); Pub. L. 105-220, § 341(b) (August 7, 1998)
(inserting "in the Smithsonian Institution," preceding "and in
the Government Printing Office.")

Section 633a, sovereign immunity prevents a disparate impact claim against the federal government from being viable based solely upon an analogy to the other portions of the ADEA or to Title VII.[15]

The Smith decision does not address Section 633a, and given the clear rule that sovereign immunity must be waived before an action can be allowed against the federal government, Plaintiff's assumption that disparate impact claims based on age filed against the Federal government are valid does not comport with either the plain language of the statute or the limited holding of the Smith case. See Breen v. Mineta, Civil Action No. 05-654, Memorandum Opinion and Order at 16, 2005 WL 3276163, *4 (D.D.C. Sept. 20, 2005) (denying preliminary injunction and concluding that "there was good reasons to doubt that plaintiffs have a cognizable ADEA disparate impact claim against the FAA and DOT

---

[15] It should be noted that a finding that Congress did not intend for Section 633a to permit disparate impact claims to be filed against the federal government is consistent with the recommendations contained in the report that the Secretary of Labor Willard Wirtz submitted, which was relied on in drafting the ADEA, entitled, Report of the Secretary of Labor, the Older American Worker: Age Discrimination in Employment (June 1965). For, as noted by Justice O'Connor in her dissenting opinion in Smith, the stated purpose of the ADEA, as contained in Section 621(b), was to prohibit "arbitrary age discrimination" in employment, which as described in the Wirtz Report equated to disparate treatment. In contrast, the Wirtz Report suggested that neutral policies with a disparate impact could be addressed through non-coercive measures.

[because] . . . there is no basis on which to conclude that the federal sovereign has waived its immunity from such suits, which must be express, not implied and inferred through interpretation.").[16]  For these reasons, Plaintiff's asserted disparate impact claim finds no clear waiver of sovereign immunity in the statute upon which he seeks to rely. Accordingly, this claim is subject to dismissal even if the Court were convinced that Plaintiff's claims were otherwise timely.

> C.    Plaintiffs' disparate treatment claims must be
>        dismissed for failure to state a claim.

It is well established that to raise an inference of disparate treatment in a discrimination case, Plaintiffs "must prove that all of the relevant aspects of [their] employment

---

[16]    Cf. Lumpkin v. Brown, 898 F.Supp. 1263 (N.D. Ill. 1995)(recognizing a federal employee's right to file disparate impact claims under the ADEA).  The Lumpkin court cites no legal authority to support its conclusion. Moreover, the decision is not based upon any principles of statutory construction.  Instead, the court bases its conclusion on an assumption about how the United States Court of Appeals for the Seventh Circuit would rule since Section 633a was adopted three years after the Griggs decision. Id.  Indeed, a later opinion in Lumpkin noted that the Court's conclusion regarding the disparate impact theory under Section 633(a) "is *not* necessary to allow plaintiffs to prevail here, for they have already done so in terms of disparate treatment." Lumpkin v. Brown, 960 F.Supp. 1339, 1352 (N.D. Ill. 1997).  In light of the analytical flaw,  as well as the fact that the case constitutes dictum from the Northern District Court of Illinois that has not been cited in any other decision, Lumpkin should not be considered either binding or persuasive precedent.

-31-

situations are 'nearly identical' to those of the employees [they] allege[ ] were treated more favorably." Childers v. Slater, 44 F. Supp.2d 8, 24 (D.D.C. 1999).  Additionally, to raise an inference of disparate treatment in an age discrimination case, plaintiffs "must point to a worker with a 'significant' or 'substantial' difference in age." Beeck v. Federal Express Corp., 81 F. Supp.2d. 48, 54 (D.D.C. 2000).  An age difference of less than ten years is not sufficient to support a prima facie inference of age discrimination.  See Breen, 2005 WL 3276163, *4 (D.D.C. Sept. 20, 2005).

    Plaintiffs assert that "[e]mployees working under other pay systems are overwhelmingly younger and receive annual increases that are included in base salary."  Amended Complaint, ¶ 2.  From the Amended Complaint it is not entirely clear to what "other pay system" the Plaintiffs' refer or to whom they seek to compare themselves.  Clearly employees in "other pay systems" are not similarly situated to Plaintiffs since the key relevant aspect of a pay discrimination complaint would be that the plaintiffs and the comparators are subject to the same exact pay policy.  See Childers, 44 F. Supp.2d at 24.  Therefore, the Amended Complaint must be dismissed because Plaintiffs have failed to state a claim since they were not treated differently.

-32-

Moreover, to the extent that Plaintiffs seek to compare themselves to those bargaining unit employees who receive annual increases as increases to their base salary, they have failed to demonstrate that they are similarly situated. In Law v. Continential Airlines, 293 F. Supp. 2d. 56 (D.D.C. 2003), the Court was faced with a similar situation.  In Law, the plaintiffs alleged age discrimination because those individuals to whom Section 9 of the collective bargaining agreement ("CBA") applied received pay protection later than those to whom Section 3 of the CBA applied.  However, each article of the CBA applied to a distinct class of individuals.  As a result, the Court found no discrimination within the statutory window because the two relevant sections of the CBA did not treat similarly situated employees differently.  In the present case, Plaintiffs' pay is determined based on the application of COMP 2-4C while the bargaining union members are paid in conformance with articles of a collective bargaining agreement.  As a result, the complaint must be dismissed because Plaintiffs have failed to state a claim since they were not treated differently than similarly situated employees.  See Marshall v. Green, 838 F.2d 1165, 1170 (11th Cir. 1988) (holding that in a Title VII race discrimination claim, "[f]irst and foremost because of their unique status in the

-33-

workplace, bargaining unit employees are never similarly situated with non-bargaining unit employees.").

Even assuming for the sake of argument that Plaintiffs intend to compare themselves only to those individuals to whom COMP 2-4C applies, they have failed to state a claim for age discrimination because there is neither a substantial nor significant different in age.  The average age of the FAA's overall workforce is 49 and the average age of the employees receiving annual pay increases as lump sum payments because their salaries are at the maximum of their pay bands is 53.  Exhibit 17, ¶ 15.  Therefore, the Amended Complaint must be dismissed for failure to state a claim or summary judgment on the claim should be entered in favor of Defendant.

V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiffs' Amended Complaint, or, in the alternative, enter summary judgment in favor of Defendant.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney

_____
R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

OF COUNSEL:

JULIA RHODES, ESQ.
Personnel & Labor Law Staff (AGC-30)
The Office of the Chief Counsel
Federal Aviation Administration
600 Independence Ave., S.W., 1st Floor
Washington, DC  20591

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MALACHY COGHLAN,                      )
                                      )
              Plaintiff,              )
                                      )
       v.                             ) Civil Action No. 05-1476 PLF
                                      )
NORMAN Y. MINETA,                     )
U.S. Department of Transportation,)
                                      )
              Defendant.              )
_____)

DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7(h), Defendant respectfully submits
this statement of material facts as to which there is no genuine
dispute.

1.  Pursuant to 49 U.S.C. § 40122 (g)(1), the FAA
Administrator was authorized to create a personnel management
system that addressed the unique demands on the Agency's
workforce, including greater flexibility in the compensation of
personnel.  See Exhibit 17 (December 28, 2005 Declaration of
Christopher K. Early), ¶ 2.

2.  In response to this mandate, the Agency convened a
Compensation Committee.  Id., ¶ 2.  The committee created, in
relevant part, the Core Compensation Pay System, which was made
available to employees in September 1999.  Id.

3.  A key part of the system is that all employees were
converted from the general schedule ("GS") to pay bands.  Id., ¶

4.

4.  The structure of each pay band is similar to the GS system in that there are minimums and maximums assigned to each pay band.  Id.; see also Exhibit 2.  The salary ranges for positions in the core compensation system, as in the GS system, are based upon the relative value of the work performed by each position.  See Exhibit 17, ¶ 4.

5.  However, in contrast to the GS system, where changes within grades are somewhat automatic and are primarily driven by continued service, a key feature of the FAA's core compensation system is that movement within the pay band is primarily driven by organizational and individual performance that correlate to the Organizational Success Increase ("OSI") and Superior Contribution Increase ("SCI") pay adjustments.  Id.

6.  Another distinct feature of the new core compensation system, which was widely publicized, is that the FAA Administrator has the flexibility to increase or decrease the maximum pay range for positions, rather than having the maximum pay range for the grades automatically increase based upon the percentage of the raise and cost of living award received by federal employees.  Id., ¶ 4; see also Exhibit 2 (Table showing Core Compensation Plan Pay Bands).

7.  Effective on March 12, 2002, Section COMP-2.21C of the

-2-

Human Resources Policy Manual ("HRPM") announced the consequence of an employee reaching a pay band maximum upon being converted into the core compensation system.  See Exhibit 17, ¶ 5; Exhibit 7 (Comp-2.21C: Grandfathered employees in the core compensation plan of the HRPM).

8.  Essentially, those employees whose salary immediately exceeded the pay band upon conversion became covered by a "grandfather provision" which allowed them to receive OSI and SCI pay adjustments as increases to their base pay.  See Exhibit 17, ¶ 5.

9.  Section COMP-2.21C of the HRPM only applied to the position that an employee held at the time of conversion, so if an employee voluntarily moved to another position or the salary for the position fell within the pay range for his or her assigned pay band, then the employee would no longer be covered by the "grandfather provision."  Id.

10.  In contrast, all employees whose salaries after the initial conversion exceeded the maximum of the pay band were to receive any pay adjustments as lump sum payments.  See Exhibit 9 (HRPM, COMP-2.4C: Annual Pay Adjustments).

11.  The annual OSI and SCI disbursements are made in January or early February of each year.  Id.; Exhibit 17, ¶¶ 6-9.

12.  On a yearly basis the FAA Administrator and

-3-

Compensation Committee review such things as a market survey, which includes the aviation and aerospace industries as well as incorporates market data from thousands of other areas, to get a comprehensive picture of the community's salary situation. See Exhibit 17, ¶¶ 2, 8.

13. This review allows the FAA to determine whether its salaries are competitive and should remain unchanged or are not competitive and should be changed. See Exhibit 17, ¶¶ 4, 7-8; Exhibit 11 (2004 Summary of Market Survey).

14. As a result of the annual review process, the pay bands were increased in 2001 and 2002. See Exhibit 12 (Administrator's Announcements from 2000 through the present).

15. However, based on the market surveys, the Administrator did not increase the pay bands in 2003, 2004, or 2005. Id.

16. In fact, all employees were notified, through briefings and broadcast messages as well as through the policy website, of the manner in which pay bands would be adjusted and of the consequences of reaching the pay band maximum for a position. See Exhibit 13.

17. Additionally, by January 12, 2003, all FAA employees were notified through a broadcast message from the Administrator that the pay band for 2003 would not be changed. See Exhibit 17, ¶ 8.

-4-

18.  The FAA Administrator's broadcast message merely reiterated pay policies about which employees had previously been notified. See id.

19.  Briefings about the elements of the Core Compensation Pay system were given to all FAA employees.  See Exhibit 1, ¶¶ 5-6; Exhibit 17, ¶¶ 6-7.

20.  In addition, orientation materials (i.e. pamphlets) containing information about elements of the plan, including Chapters Comp-2.4C and 2.21C, were given to all employees and the information was also available through a website dedicated to communicating details about the plan.  See Exhibit 1, ¶¶ 5-6; Exhibit 17, ¶¶ 6-7.

21.  Plaintiffs received one or more Standard Form 50s ("SF-50") that reflected that their salaries were at the pay band maximum for his position and also indicating that they were receiving a lump sum payment.  See Exhibit 14 (Coghlan SF-50s); Exhibit 16 (O'Hara SF-50s).

22.  Plaintiffs were at relevant times in Pay Band J, with a maximum base pay figure of $102,300.00.  See Exhibit 2 at 1; Exhibit 14; Exhibit 16 at 7; Exhibit 17, ¶ 13.

23.  On January 11, 2004, Plaintiff Coghlan received a portion of his annual pay adjustment as an increase to his base pay, which rose to the pay band maximum and the remainder of his

annual pay adjustment as a lump sum award.  <u>See</u> Exhibit 2 at 1; Exhibit 14.

24.  The SF-50s approved January 11, 2004, revealed to Plaintiff Coghlan in January 2004 that his Base Pay was limited to the $102,300 figure, but Plaintiff Coghlan was also eligible for a lump sum group cash award that did not increase his base pay.  <u>See</u> Exhibit 14 at 1-3.

25.  Thus, by January 2004, Plaintiff Coghlan had received actual notice regarding the consequences of the core compensation policies on his pay and benefits.  <u>Id</u>.

26.  Adjustments were also approved for Plaintiff Coghlan on May 24, 2004, but again he waited beyond 45 days to seek Equal Employment Office ("EEO") counseling.  <u>See</u> Exhibit 14 at 4-6; Exhibit 3 at 2.

27.  In fact, Plaintiff Coghlan did not contact an EEO Counselor about his individual complaint of age discrimination until August 10, 2004.  Exhibit 3 at 2.

28.  Plaintiffs do not allege and the Agency is aware of no evidence that Plaintiffs provided notice, by February 12, 2004,

to the EEOC of any intent to file an ADEA complaint directly in district court.  <u>See</u> Amended Complaint, ¶¶ 7-9.

29.  The average age of the FAA's overall workforce is 49 years old.  Exhibit 17, ¶ 15.

30.  The average age of the employees receiving annual pay increases as lump sum payments because their salaries are at the maximum of their pay bands is 53 years old.  Exhibit 17, ¶ 15.

31.  If Plaintiffs Coghlan and O'Hara had remained under the GS system, (excluding locality pay) their current base salaries would be $101,130.  Thus, they have benefitted financially from the Core Compensation Plan.  <u>See</u> Exhibit 17, ¶ 13.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, DC Bar #451058
United States Attorney

_____
R. CRAIG LAWRENCE, DC Bar #171538
Assistant United States Attorney

_____
W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Defendant's Renewed Motion To Dismiss Or, In The Alternative, For Summary Judgment, supporting memorandum, statement of material facts, attachments and a proposed order has been made through the Court's electronic transmission facilities on this 23rd day of January, 2006.

W. MARK NEBEKER, DC Bar #396739
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, DC  20530
(202) 514-7230