UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| MALACHY COGHLAN, et. al,<br>Plaintiffs<br><br>v.<br><br>NORMAN Y. MINETA, SECRETARY<br>DEPARTMENT OF TRANSPORTATION<br>Defendant | C.A. No. 05-1476(PLF) |

### DECLARATION OF CHRISTOPHER K. EARLY

I, Christopher K. Early, voluntarily and knowingly make the following statement.

1. I am the manager of the Policy Management Division (AHP-300) in the Office of Human Resources in the Federal Aviation Administration (FAA). My responsibilities include developing and providing policy and guidance regarding the FAA's Core Compensation Plan.

2. Pursuant to Section 40122 (g)(1) of Title 49 of the United States Code, the FAA Administrator was authorized to create a personnel management system that addressed the unique demands on the agency's workforce, including greater flexibility in the compensation of personnel. In response to this mandate, the Agency convened a Compensation Committee. The committee created, in relevant part, the Core Compensation Plan, which was subsequently approved by the FAA Administrator and initially implemented starting in July 1998 in one FAA line of business for approximately 1,800 employees, and expanded agency-wide in April 2000.

3. One of the purposes of the Core Compensation Plan was to create a pay for performance system. In other words, Core Compensation was designed to give managers



the flexibility to reward high performers who made the greatest contribution to the Agency's mission, and to make the salaries within the FAA competitive in an effort to attract and retain a talented workforce. As a result, in the new compensation system, performance, as opposed to longevity or tenure, was to be the primary factor driving any annual pay increases or promotions. At the same time, no additional funding was appropriated to establish such a system. Instead, the FAA was tasked with creating a pay for performance system within the confines of its existing fiscal appropriations.

4. A key part of the system is that all employees would be converted from the general scheduled (GS) to pay bands. The structure of each pay band is similar to the GS system in that there are minimums and maximums assigned to each pay band. The salary ranges for positions in the core compensation system, as in the GS-system, is based upon the relative value of the work performed by each position. However, in contrast to the GS system where changes within grades are generally automatic and are primarily driven by continued service, a key feature of the FAA's core compensation system is that movement within the pay band is primarily driven by organizational and individual performance, which correlates to the OSI and SCI pay adjustments. Another feature of the core compensation system, which was widely publicized, is that the FAA Administrator has the flexibility to increase or decrease the minimum and maximum pay rates for each of the pay bands based on an annual assessment of FAA pay rates versus a market survey analysis, including both private and public sector comparators.

5. As part of the development of the core compensation plan, a policy was created to address how to distribute annual pay adjustments to employees who were at the maximum of their pay band. Chapter COMP-2.21C: Grandfathered Employees in the

Core Compensation Plan of the Human Resource Policy Manual (HRPM) addressed the issue of an employee reaching a pay band maximum upon being converted into the core compensation system. Essentially, those employees whose salary immediately exceeded the pay band upon conversion became covered by a "grandfather provision" which allowed them to receive OSI and SCI pay adjustments as increases to their base pay. This provision only applied to the position that an employee held at the time of conversion, so if an employee voluntarily moved to another position or the pay rate fell within the pay range for his/her assigned pay band, then s/he would no longer be covered by the "grandfather provision." This chapter was issued effective March 12, 2002, but the policy contained in the chapter was effective as of the original agency-wide implementation date of April 23, 2000, and employees were notified of it through the core compensation website and numerous briefings and orientation materials. The "grandfather provision" was subsequently terminated by the agency in June 2005, the result being that no employees subsequently converted to the Core Plan will be eligible for base pay increases if their pay rate is at or above the band maximum.

6. It is important to note that the date of conversion was not the same for all FAA employees. All non-bargaining unit employees were converted on April 23, 2000. However, the conversion for bargaining unit employees occurred later and depending on when the FAA and the relevant union reached agreement over implementation of the pay system.

7. Under HRPM chapter Comp-2.4C: Annual Pay Adjustments, all employees whose salaries after the initial conversion met or exceeded the maximum of the pay band receive any pay adjustments as lump sum payments. This chapter also became effective

March 12, 2002, but the policy contained in the chapter was also effective as of the original agency-wide implementation date of April 23, 2000. Employees were notified of the policy through the core compensation website and numerous briefings and orientation materials that were provided starting in late 1999 and continuing through mid-2000.

8.   On a yearly basis the FAA Administrator reviews the annual market survey, which focuses on aviation and aerospace industries as well as incorporates market data from thousands of other companies and public sector organizations to get a comprehensive picture of the private and public sector salary structures. This review allows the Administrator to determine whether the FAA's pay band ranges are competitive and should remain unchanged or are not competitive and should be changed. As a result of this annual review process, the pay bands were increased in 2001 and 2002. However, based on the market survey results, the Administrator did not change the pay bands in 2003, 2004, and 2005. Id. In fact, earlier than January 12, 2003, all FAA employees were notified through a broadcast message that the pay bands for 2003 would not be changed. Thus, for the first time, the consequences of the FAA Administrator having been authorized under the core compensation system to increase, decrease or not change the pay bands was demonstrated to the workforce.

9.   Decisions about the award of the annual OSI and SCI disbursements are typically made in December or January of each year. Any pay adjustments do not become effective until a date determined by the Administrator, typically no later than the first pay period in January of each year. Employees receive hard copies of statements of earnings and leave reflecting the OSI and SCI payments that they have been granted by no later than the first week in February each year.

10. As of September 1, 2005, there were 20,632 employees covered by the Core Compensation Plan. There were 1,936 employees covered by HRPM Chapter Comp-2.4C: Annual Pay Adjustments who were at the maximum of their pay band. These employees receive lump sum payments whenever they receive OSI or SCI payments. There were an additional 62 employees who were paid above the maximum for their pay band, but were also covered by HRPM Chapter Comp-2.4C: Annual Pay Adjustments, and also receive lump sum payments for OSI and SCI. In addition, there were 10,652 employees who were paid below the maximum of their assigned pay bands, but who were also covered by the provisions contained in HRPM, Comp-2.4C: Annual Pay Adjustments, in the event that their salaries at some point reach or exceed the band maximums.

11. As of September 1, 2005, there were 7,982 employees who were not covered by HRPM Chapter Comp-2.4C: Annual Pay Adjustments, so receive any pay adjustments as increases to their base salary even if they are at or above the pay band maximum. There were 1,051 employees (of the 7,982) who were "grandfathered" upon conversion to the Core Plan or a negotiated version of the Core Plan. In addition, there were 3,563 bargaining unit members who exceed the maximum of their pay bands, but who still receive any annual pay adjustments as increases to their base pay. These base pay adjustments are made pursuant to the National Air Traffic Controllers Association (NATCA) collective bargaining agreement for Engineers and the Professional Airway Systems Specialist (PASS) collective bargaining agreement for technicians, each of which contains articles specifying that employees in some positions covered by the collective bargaining agreements will receive any annual pay adjustments as increases to

their "basic pay." In others words, due to collective bargaining agreements, there are employees in two bargaining units currently not covered by the provisions contained in HRPM, Comp-2.4C: Annual Pay Adjustments. In addition, there were 3,368 employees within these same two bargaining units who were paid below the maximum of their assigned pay bands, but who would also be exempt from the provisions contained in HRPM, Comp-2.4C: Annual Pay Adjustments, in the event that their salaries at some point reach or exceed the band maximums.

12. On January 11, 2004, Malachy Coghlan received a portion of his annual pay adjustment as an increase to his base pay which rose to the pay band maximum and the remainder of his annual pay adjustment as a lump sum award. Similarly, on December 30, 2001, Timothy O'Hara received a portion of his annual pay adjustments as an increase to his base pay, which rose to the pay band maximum, and the remainder of his annual pay adjustment as a lump sum award. For all subsequent pay adjustments occurring after December 30, 2001, Mr. O'Hara has received lump sum payments for each pay adjustment.

13. Both Mr. Coghlan and Mr. O'Hara have benefited financially from the FAA's implementation of the Core Compensation Plan. For example, Mr. Coghlan's and Mr. O'Hara's base salary rates under the GS system (excluding locality pay) would currently be $101,130. However, under the Core Compensation Plan, both have a current base salary rate (excluding locality pay) of $102,300.

14. Beginning on June 27, 2004, both Mr. O'Hara and Mr. Coghlan, as well as myself and other employees at the top of our pay bands, began receiving communications from Mark Lash. From this initial communication Mr. Lash encouraged each of us to file a

discrimination complaint based on age discrimination in light of the compensation policies that resulted in us receiving a lump sum payment for annual pay adjustments if our salaries were at the pay band maximum. Mr. Lash's communications on this topic were sent at least monthly and sometimes more frequently. These communications continued through January 11, 2005, when Timothy O'Hara assumed responsibility for encouraging individuals at the top of their pay band to file age discrimination complaints based on the FAA's compensation policy.

15. The average age of the FAA's workforce is approximately 49 years old. The average age of the employees currently covered by HRPM Chapter Comp-2.4C: Annual Pay Adjustments and receiving pay adjustments as lump sum payments is 53 years old. Similarly, the average age of the employees "grandfathered" under Comp-2.4C and receiving pay adjustments as increases to base pay is 53 years old. And the average age of those bargaining unit members who are at their pay band maximum and receiving pay adjustments as increases to base pay is 52 years old. In other words, there is not a significant difference in the average age of those who are exempted from Comp-2.4C, i.e., 52.5, and those who are covered by the policy, i.e., 53.

I declare under penalty of perjury that the foregoing is accurate and correct.

Executed in Washington, DC on the 28th day of December 2005.

*[signature]*

Christopher K. Early, Manager
Policy Management Division
Office of Human Resource Management

Federal Aviation Administration
600 Independence Avenue, SW, 1st Floor
Washington, DC 20591