UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                                    )
MALACHY COGHLAN, *et al.*,                          )
                                                    )
            Plaintiffs,                             )
                                                    )
      v.                                            )        Civil Action No. 05-1476 (PLF)
                                                    )
MARY E. PETERS, Secretary,                          )
United States Department of Transportation,[1]      )
                                                    )
            Defendant.                              )
———————————————————————— )

OPINION

        This matter is before the Court on defendant's renewed motion to dismiss the

amended complaint for lack of subject matter jurisdiction and for failure to state a claim

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively, or,

in the alternative, for summary judgment.[2]  On March 31, 2008, this Court issued an Order and

Judgment granting defendant's motion, and noting that an Opinion explaining the Court's

reasoning would follow.  The Court now sets forth its reasoning.

_____

        [1]      The amended complaint names Norman Y. Mineta, former Secretary of
Transportation, as the party defendant.  The Court substitutes his successor, Mary E. Peters,
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

        [2]      The papers submitted in connection with this matter include: Defendant's
Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment ("Def.'s Mot.");
Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary
Judgment ("Pls.' Opp."); Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to
Dismiss or in the Alternative Motion for Summary Judgment ("Def.'s Reply"); Plaintiffs'
Response to the Court's May 30, 2007 Order Regarding Whether Ledbetter v. Goodyear Tire &
Rubber Company Renders Plaintiffs' Claims Untimely ("Pls.' Supp."); Defendant's Response to
the Court's May 30, 2007 Order Regarding Ledbetter v. Goodyear Tire & Rubber Company
("Def.'s Supp."); and Plaintiffs' Reply to Defendant's Response to the Court's May 30, 2007
Order Regarding Ledbetter v. Goodyear Tire & Rubber Company ("Pls.' Supp. Reply").

## I. BACKGROUND AND PROCEDURAL POSTURE

This is a dispute about the employee compensation policies of the Federal Aviation Administration, an agency within the United States Department of Transportation. Plaintiffs Malachy Coghlan and Timothy O'Hara bring suit under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), on behalf of themselves and similarly situated FAA employees. They allege that the FAA's pay practices discriminate against employees who, like themselves, are more than 40 years of age and earn the maximum salary possible for their respective positions. See Pls.' Opp. at 3-4; see also Am. Compl. ¶¶ 29-31.

Mr. Coghlan filed suit in this Court on July 27, 2005. The original complaint asserted ADEA claims on behalf of Mr. Coghlan and all similarly situated FAA employees based on allegedly discriminatory pay setting decisions the FAA made in 2004. An amended complaint was filed on December 20, 2005. The amended complaint added Mr. O'Hara as a class representative and asserted claims on behalf of all similarly situated FAA employees based on allegedly discriminatory pay setting decisions the FAA made in 2005.

On January 23, 2006, defendant moved to dismiss or, in the alternative, for summary judgment. On March 29, 2007, this Court issued an Order denying defendant's motion. On May 29, 2007, the Supreme Court issued its decision in Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162 (2007). Because that decision addressed the timeliness of administrative complaints of pay discrimination – an issue crucial to this case – the Court vacated its Order denying defendant's motion, and ordered the parties to submit supplemental briefs addressing "whether, in view of the Supreme Court's decision in Ledbetter, plaintiffs' ADEA pay discrimination claim is untimely." Coghlan v. Peters, Civil Action No. 05-1476,

Order Vacating March 29, 2007 Order (D.D.C. May 30, 2007). The parties filed those briefs, the

Court decided the matter by Order of March 31, 2008, and the Court now explains that decision.

## II. GOVERNING LAW

"The ADEA broadly bars age discrimination in employment. And it provides a

federal government employee two alternative avenues to judicial redress." Rann v. Chao, 346

F.3d 192, 195 (D.C. Cir. 2003), cert. denied, 543 U.S. 809 (2004). First, pursuant to 29 U.S.C.

§§ 633a(c) and 633a(d), an employee may bring his claim directly to federal court "so long as,

within 180 days of the allegedly discriminatory act, he provides the [Equal Employment

Opportunity Commission] with notice of his intent to sue at least 30 days before commencing

suit." Id. Second, pursuant to 29 U.S.C. §§ 633a(b) and 633a(c), an employee may choose to

pursue his claims administratively in the first instance and then file suit in federal court if he is

dissatisfied with the results of the administrative process. See id.; see also Stevens v. Dep't of

Treasury, 500 U.S. 1, 5-6 (1991).

Employees who choose the latter route must "consult [an EEO] Counselor prior to

filing a [formal administrative] complaint in order to try to informally resolve the matter."

29 C.F.R. § 1614.105(a). This initial contact must be made "within 45 days of the date of the

matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the

effective date of the action." 29 C.F.R. § 1614.105(a)(1). "As a general rule, discrimination

claims alleging conduct that occurred more than 45 days prior to the initiation of administrative

action are time-barred in a subsequent action." Velikonja v. Ashcroft, 355 F. Supp. 2d 197, 204

(D.D.C. 2005). Mr. Coghlan and Mr. O'Hara chose to pursue their administrative remedies in

the first instance. As a result – and as they acknowledge – they were required timely to pursue

their administrative remedies with respect to all the claims they seek to pursue here and to

exhaust those remedies before coming to court.  See Pls.' Opp. at 14-16.

### III.  STANDARD OF REVIEW

#### A.  Rule 12(b)(1), Rule 12(b)(6), or Rule 56?

Defendant seeks dismissal of the amended complaint pursuant to Rule 12(b)(1)

and Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, summary

judgment.  See Def.'s Mot. at 1.  Thus, at the outset, the Court must address how to treat

defendant's motion and identify the applicable standard of review.

As an initial matter, the Court concludes that it would be inappropriate to treat

defendant's motion as a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1).  It remains unclear in this Circuit whether or not the ADEA's administrative exhaustion

requirements are jurisdictional.  See Rann v. Chao, 346 F.3d at 194-95.  In light of that

uncertainty, this Court will give plaintiffs the benefit of the doubt and assume that the exhaustion

requirement is *not* jurisdictional.  See Woodruff v. Peters, Civil Action No. 05-2071, 2007 WL

1378486, at *5 (D.D.C. May 9, 2007).  Accordingly, the Court will not regard defendant's

exhaustion argument as an attack on this Court's subject matter jurisdiction.[3]

Nor will the Court address defendant's motion as a motion to dismiss for failure

to state a claim pursuant to Rule 12(b)(6).  That course would be inappropriate here because both

parties refer to and rely on matters outside the pleadings, and when "matters outside the

---

[3]     Although it is not clear from defendant's papers, it may be that defendant invokes
Rule 12(b)(1) only in service of its argument that plaintiffs may not pursue their disparate *impact*
claims because the ADEA does not waive the United States' sovereign immunity for such
claims.  See Def.'s Mot. at 24-31.  The Court need not address whether the ADEA allows
disparate impact claims against federal employers in light of the analysis below.

4

pleadings are presented to and not excluded by the court [on a motion to dismiss pursuant to Rule 12(b)(6)], the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).  Therefore, as both parties have had an adequate opportunity to present all materials pertinent to summary judgment, see FED. R. CIV. P. 12(d), the Court will consider those "matters outside the pleadings" on which the parties rely, and treat defendant's motion as a motion for summary judgment under Rule 56.

### B.  Summary Judgment Standard

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P.  56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc ); Washington Post Co. v. Dep't of Health and Human Services, 865 F.2d 320,

325 (D.C. Cir. 1989).  On a motion for summary judgment, the Court must "eschew making

credibility determinations or weighing the evidence."  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363

(D.C. Cir. 2007).

       The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations or other

competent evidence setting forth specific facts showing that there is a genuine issue for trial.

<u>See</u> FED. R. CIV. P. 56(e)(2); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The non-

moving party is "required to provide evidence that would permit a reasonable jury to find" in his

favor.  <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249-50; <u>see</u> <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776

(2007) ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, 'there is no genuine issue for trial.'") (quoting <u>Matsushita Electric Indus. Co.</u>

<u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  To defeat summary judgment, a plaintiff must

produce more than "a scintilla of evidence to support his claims."  <u>Freedman v. MCI</u>

<u>Telecommunications Corp.</u>, 255 F.3d 840, 845 (D.C. Cir. 2001).

## IV.  THE CORE COMPENSATION SYSTEM AND PLAINTIFFS' CLAIMS

       Beginning in 2000, the FAA gradually "converted" most (but not all) of its

employees from one pay system, known as the General Schedule system, to a new pay system,

called the Core Compensation System.  <u>See</u> Def.'s Mot. at 8 n.4; Pls.' Opp. at 11.[4]  Under the

---

    [4]    Plaintiffs Coghlan and O'Hara were compensated under the Core Compensation
System at all times relevant to this suit.  <u>See</u> Pls.' Opp. at 8.

Core Compensation System, each employee's position falls within a particular "pay band" – a compensation range defined by a minimum and maximum salary.  See Def.'s Mot. at 7.  Pay bands are adjustable – that is, the FAA Administrator may adjust the minimum and maximum salaries for pay bands when he or she deems it appropriate to do so.  The Administrator makes this decision on an annual basis.  See id. at 8-11.[5]

FAA employees subject to the Core Compensation System receive salary increases within their pay band in the form of discretionary raises.  See Def.'s Mot. at 7-8. These discretionary raises, which are based on individual and organizational performance, are awarded on an annual basis in January or February.  See id. at 9.  Most FAA employees receive their raises subject to a policy that this Court will refer to as the "lump sum policy."  Under this policy, if an employee's base salary equals or exceeds the pay band maximum at the time the employee is awarded an annual pay raise, the employee receives his or her pay raise as a lump sum cash payment rather than as an increase to his or her base salary.  See id. at 8-9; see also id., Ex. 9, Human Resources Policy Manual, COMP-2.4C: Annual Pay Changes in the Core Compensation System ("FAA HR Policy Manual") (setting forth the lump sum policy).

The lump sum policy does not apply to all FAA employees.  For example, the FAA's "non-converted" employees – those employees who continue to be compensated under the General Schedule system – receive annual pay raises as base salary increases even if they earn the maximum salary for their respective positions.  See Pls.' Opp. at 11; id., Ex. 1, Plaintiffs' Statement of Material Facts In Dispute ¶ 10 ("Pls.' Facts").  In addition, some FAA employees who *have* been converted to the Core Compensation System nevertheless are *not*

_____

[5]     According to defendant, these decisions are based largely on a market survey of the aviation industry, the aerospace industry, and related industries.  See Def.'s Mot. at 9-10.

subject to the lump sum policy.  These employees are parties to collective bargaining agreements which require that their annual pay raises be awarded as salary increases rather than lump sum payments, even if their salaries meet or exceed the pay band maximum.  <u>See</u> Def.'s Mot. at 9 n.5; <u>id.</u>, Ex. 17, Declaration of Christopher K. Early ¶ 11.  Finally, a significant number of FAA employees were "grandfathered" into the Core Compensation System.  <u>See</u> Def.'s Mot. at 8-9. The FAA permits these employees, whose salaries met or exceeded the pay band maximum at the time they were converted, to continue receiving annual pay raises in the form of base salary increases rather than lump sum payments.  <u>See id</u>.

Plaintiffs argue that the FAA's practice of awarding raises in the form of lump sum payments to some FAA employees who earn the highest possible salary for their positions but not to others amounts to age discrimination under the ADEA.  Plaintiffs point out that in years when the FAA decides not to adjust the pay bands, those "high earners" who are compensated under the Core Compensation System, are not part of a collective bargaining agreement, and were not "grandfathered" into the Core Compensation System receive their annual raises as lump sums rather than as salary increases.  In contrast, those high earners who are compensated under the General Schedule system, *or* compensated under the Core Compensation System but are part of a collective bargaining agreement, *or* were grandfathered into the Core Compensation System receive their annual raises as salary increases even if the FAA decides not to adjust the pay bands.

According to Mr. Coghlan and Mr. O'Hara, this differential treatment violates the ADEA for two reasons.  First, plaintiffs maintain that lump sum payments are less desirable than salary increases because (1) they reduce the size of affected employees' pay checks (because affected employees receive annual pay raises as one-time lump sum payments rather than

increases to base salary), and (2) they adversely affect employees' retirement and life insurance benefits (because the accrual of those benefits is linked to base salary).  See Am. Compl. ¶¶ 16-17.  Second, plaintiffs contend that, as a practical matter, those high earners who receive their raises as lump sums are older, as a group, than those high earners who do not.  See Pls.' Opp. at 11-12.  Thus, plaintiffs argue (1) that the FAA has engaged in and continues to engage in disparate treatment of older workers because the FAA is "aware [the Core Compensation System and lump sum policy] compensate[] older employees less favorably" but adheres to its system nonetheless, Am. Compl. ¶ 30; (2) that Mr. Coghlan, Mr. O'Hara and similarly-situated FAA employees suffer a "continuing violation" of their rights as a result of the FAA's pay system, id. ¶ 31; and (3) that the FAA's pay system has a disparate impact on older workers.  See id. ¶ 29.

## V.  DISCUSSION

Defendant maintains that plaintiffs failed to initiate administrative proceedings within 45 days of any of the matters alleged to be discriminatory, and hence that all of plaintiffs' claims are time-barred.  The Court agrees, and it therefore will enter summary judgment in favor of defendant on all of plaintiffs' claims.

### A.  Plaintiffs' Administrative Complaints

#### 1.  2004 Complaints

At some point in late 2003 or early 2004, the FAA Administrator decided (and presumably announced) that the pay band maximums would not be increased for 2004.  See Def.'s Mot. at 10.[6]  Soon thereafter – on January 11, 2004 – Mr. Coghlan received an annual pay

---

[6]       The parties' papers do not indicate exactly when the FAA Administrator made or announced this decision, but the Court assumes the decision must have been made and

raise.  See Pls.' Facts ¶ 23.  Because his salary did not meet or exceed the pay band maximum at that time, a portion of this raise was added to his base salary.  After that portion had been added, however, Mr. Coghlan's base salary met or exceeded the pay band maximum.  Thus, pursuant to the lump sum policy, the remainder of his raise was awarded as a lump sum payment rather than as a (further) salary increase.  See id.; see also Def.'s Mot. at 15.  This result was reflected in pay records received by Mr. Coghlan on or about January 11, 2004.  See Pls.' Facts ¶¶ 21-26.

On August 10, 2004, Mr. Coghlan contacted an EEO counselor and complained that the 2004 lump sum raise amounted to "disparate treatment" of himself and similarly situated employees.  Def.'s Mot., Ex. 3, EEO Counselor's Report Regarding Malachy Coghlan's Informal EEO Complaint at 2 (Oct. 19, 2004) ("2004 Coghlan Informal Compl.").  Mr. Coghlan subsequently filed a formal administrative complaint with the Department of Transportation's Office of Civil Rights on September 27, 2004.  See Def.'s Mot., Ex. 4, 2004 Formal EEO Complaint of Malachy Coghlan (Sept. 27, 2004) ("2004 Coghlan Formal Compl.").

Mr. Coghlan's formal complaint was rejected by the Department of Transportation's Office of Civil Rights on December 13, 2004, in part because the Office concluded that Mr. Coghlan should have "reasonably suspect[ed]" discrimination no later than when he received part of his annual pay raise as a lump sum on January 11, 2004, and therefore should have filed an administrative complaint long before he actually did.  Def.'s Mot., Ex. 5, Office of Civil Rights Final Decision at 3 (Dec. 13, 2004).  Mr. Coghlan appealed this decision to the Equal Employment Opportunity Commission on January 12, 2005.  On March 11, 2005,

_____

announced some time before Mr. Coghlan received his first pay check reflecting the decision on January 11, 2004.  As discussed below, the parties' failure to identify the date on which the FAA Administrator made or announced this decision ultimately has no bearing on the Court's analysis of the timeliness of plaintiffs' administrative complaints.  See infra note 11.

10

the EEOC affirmed the decision of the Department's Office of Civil Rights.  See Coghlan v.

Mineta, EEOC Appeal No. 01A52152, 2005 WL 636384, at *1-2 (Mar. 11, 2005).  The EEOC

denied Mr. Coghlan's request for reconsideration of its decision on April 27, 2005, at which

point Mr. Coghlan's administrative remedies had been exhausted.  See Coghlan v. Mineta,

EEOC Appeal No. 01A52152, 2005 WL 1073773, at *1 (Apr. 27, 2005).

### 2.  2005 Complaints

In late 2004, the FAA Administrator once again decided not to adjust the pay

bands for the coming year.  See Def.'s Supp. at 6.  Defendant asserts, and plaintiffs do not

dispute, that the Administrator announced her decision not to adjust the pay bands for 2005 at "a

town hall meeting" on November 9, 2004, during which the Administrator "advised all FAA

employees, who attended the meeting either in person or via a web cast, or who read the

statements on the employee website, that the latest market survey data did not support an

increase of the pay bands."  Id.

Mr. O'Hara received an annual pay raise on January 14, 2005.  See Def.'s Mot.,

Ex. 18, EEO Counselor's Report Regarding Timothy O'Hara's Informal EEO Complaint at 2

(Mar. 11, 2005).  Because his salary at the time met or exceeded the pay band maximum, he

received the raise as a lump sum payment.  See id.[7]  On February 23, 2005, Mr. O'Hara

contacted an EEO counselor and complained that the issuance of some workers' raises as lump

sum payments on January 14, 2005 had a "disparate and discriminatory effect" on him and other

similarly situated employees.  Id.  On March 23, 2005, Mr. O'Hara and Mr. Coghlan both filed

---

[7]     This was not the first time Mr. O'Hara received a pay raise as a lump sum.  In
fact, because his salary reached the pay band maximum on December 31, 2001, all the raises he
received in 2003, 2004 and 2005 were disbursed as lump sum payments.  See Def.'s Mot. at 12.

formal administrative complaints asserting that the FAA Administrator discriminated against them and similarly situated employees by issuing their January 14, 2005 raises as lump sum payments.  See Def.'s Mot., Ex. 19, 2005 Formal EEO Complaint of Timothy O'Hara (Mar. 23, 2005) ("2005 O'Hara Formal Compl.") and 2005 Formal EEO Complaint of Malachy Coghlan (Mar. 23, 2005) ("2005 Coghlan Formal Compl.").  Plaintiffs subsequently withdrew the 2005 complaints after filing the instant suit.

### B.  *Ledbetter* and *"Pay-Setting Decisions"*

In Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162 (2007), the Supreme Court clarified how to analyze the timeliness of administrative complaints in the pay discrimination context.  In Ledbetter, the plaintiff, Lilly Ledbetter, alleged that her employer, Goodyear Tire, had intentionally discriminated against her on the basis of her sex (and hence in violation of Title VII of the Civil Rights Act of 1964) by giving her an unfavorable performance rating or ratings some time before 1997.  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2165-67.  The unfavorable rating or ratings, in turn, led to her receiving smaller pay checks from 1997 onward, and resulted in her being denied a raise in 1998.  See id.  Ms. Ledbetter did not initiate administrative proceedings until March 1998 – far more than 180 days after the allegedly discriminatory rating(s), and thus well beyond the applicable administrative charging period.  See id.[8]

---

[8]    "An individual wishing to challenge an employment practice under [Section 2000e-5(e)(1) of Title VII] must first file a charge with the EEOC. . . .  Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) after the alleged unlawful employment practice occurred, . . . and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court.  [See 42 U.S.C. § 2000e-5(f)(1).]"  Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2166-67 (internal quotation marks and citation omitted).

Goodyear argued that Ms. Ledbetter's claims of pay discrimination were time-barred because the conduct of which she complained – that is, the unfavorable rating(s) – had occurred outside the charging period.  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2166.  Ms. Ledbetter responded that her claims were timely for two reasons: (1) the unfavorable rating(s) reduced the size of each subsequent pay check, making each subsequent pay check a discrete act of discrimination that triggered a new charging period, and (2) the denial of the raise in 1998 – which she conceded was not itself motivated by discriminatory animus – "carried forward [the effects of] intentionally discriminatory disparities from prior years."  Id. at 2167 (quoting petitioner's reply brief).

The Supreme Court rejected Ms. Ledbetter's view.  The Court reasoned as follows: When the allegedly discriminatory matter complained of is a "discrete act" of discrimination, the time for filing an administrative complaint about that act "begins when the discriminatory act occurs."  Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2165.  "[B]ecause a pay-setting decision is a discrete act, it follows that the period for filing an EEOC charge begins when the [pay-setting decision] occurs."  Id.  Moreover, "[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."  Id. at 2169.  For that reason, Ms. Ledbetter could not rely on the issuance of subsequent pay checks or Goodyear's refusal to give her a raise to make her claim timely.  Both the pay checks and the denial of the raise were merely "nondiscriminatory acts that entail[ed] adverse effects resulting from past discrimination."  Id.  Ms. Ledbetter, therefore, should have filed an EEOC charge within 180 days of any "act that consummat[ed] the discriminatory employment practice" of which she complained – that is, within 180 days of the date on which an allegedly discriminatory

13

pay decision was "made and communicated" to her.  Id. at 2170 (quoting Delaware State College v. Ricks, 449 U.S. 250, 258 (1980)).

The import of Ledbetter for this case is clear.  The gravamen of Mr. Coghlan's and Mr. O'Hara's claims is that the FAA intentionally made certain pay-setting decisions about annual raises, even though they knew that such decisions would adversely affect some older workers.  The Supreme Court in Ledbetter held that such allegedly discriminatory "pay-setting decisions" are discrete acts which trigger the charging period for filing administrative complaints.  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2165.  It follows that, in order to pursue their pay discrimination claims before this Court, Mr. Coghlan and Mr. O'Hara must have filed administrative complaints within 45 days of the discrete pay-setting decision (or decisions) that "consummat[ed] the discriminatory employment practice" of which they complain.  Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2170.  Otherwise, plaintiffs' claims are time-barred.[9]

_____

[9]    Plaintiffs point out that Ledbetter addressed the timeliness of administrative complaints in the context of a disparate *treatment* suit, and suggest that a different timeliness analysis therefore should apply to their disparate *impact* claims.  See Pls.' Supp. at 6-7.  The Court cannot see why.  The applicable regulations make no distinction between persons aggrieved by discrete acts constituting disparate treatment and persons aggrieved by discrete acts resulting in disparate impact.  See 29 C.F.R. §§ 1614.105(a), 1614.105(a)(1).  Moreover, Mr. Coghlan and Mr. O'Hara have asserted their disparate treatment and disparate impact claims *in tandem* from the beginning of the administrative process.  There is no suggestion that plaintiffs began to suspect that the FAA's practices had a disparate impact on older workers after they began to suspect that the FAA's practices constituted disparate treatment of older workers, and the same practice forms the basis for both theories of discrimination.  The Court therefore concludes that there is no need to distinguish between plaintiffs' two theories of discrimination for purposes of analyzing whether their administrative complaints were timely.

### C.  Identifying the Relevant "Pay-Setting Decisions"

Plaintiffs argue that there are two relevant pay-setting decisions in this case: (1) the FAA's decision to issue part of Mr. Coghlan's 2004 raise as a lump sum payment on January 11, 2004, which they assert triggered a charging period for complaining about the FAA's conduct in 2004, see Pls.' Supp. Reply at 5; and (2) the FAA's decision to issue Mr. O'Hara's 2005 raise (and presumably Mr. Coghlan's 2005 raise) as a lump sum payment on January 14, 2005, which they assert triggered a charging period for complaining about the FAA's conduct in 2005.  See Pls.' Opp. at 16; Pls.' Supp. at 6.

Defendant responds that there is only one relevant pay-setting decision in this case: the FAA's decision to implement the pay band adjustment policy and the lump sum policy in 2002.  According to defendant, that decision consummated the allegedly discriminatory pay practice of which plaintiffs complain, and thus triggered the charging period for all of their claims.  See Def.'s Supp. at 10-12; id. at 13 (plaintiffs' complaints are based on "present-day effects [that are] the result of . . . a facially neutral policy that became effective in 2002 regarding how annual pay adjustments would be made").

The Court disagrees with both sides. As explained below, under the reasoning and decision in Ledbetter, there are two relevant pay-setting decisions in this case: the FAA's decision not to adjust the pay bands for 2004, and the FAA's decision not to adjust the pay bands for 2005.  It appears that the 2004 pay band decision was made no later than January 11, 2004, when Mr. Coghlan received a lump sum payment reflecting that decision, see supra note 6, while the 2005 pay band decision was made no later than November 9, 2004, when it was announced by the FAA Administrator at an agency-wide meeting.  See supra at 11; see also infra at 23.  As discussed more fully below, those two discrete acts – and not the earlier act identified by

15

defendant or the later acts identified by plaintiffs – triggered plaintiffs' obligation to seek administrative relief.  Because plaintiffs failed to seek EEO counseling within 45 days of the 2004 pay band decision or the 2005 pay band decision, this Court must conclude that their claims are untimely.

    1.  The 2002 Adoption of the FAA's Pay Policies Is Not the Relevant Decision

        Defendant argues that the FAA's decision to adopt the pay band adjustment policy and the lump sum policy in 2002 constitutes the relevant "pay-setting decision" for purposes of a timeliness analysis under Ledbetter.  The Court disagrees.

        According to defendant, the decision to adopt these policies in 2002 is the relevant pay-setting decision because that decision is "*the only reason* the annual pay adjustments [were] not included in [plaintiffs'] base salary" in January 2004 and January 2005. Def.'s Supp. at 12 (emphasis added).  But that is simply not the case.  It is true that it was necessary for the FAA to adopt these policies in 2002 for plaintiffs to receive their raises as lump sum payments in January 2004 and January 2005 – but it was not sufficient.  Rather, in order for plaintiffs to receive their raises as lump sum payments in January 2004 and January 2005, the FAA had to make two additional, discrete decisions *after* it adopted its pay policies in 2002: (1) a decision not to adjust the pay bands for 2004 (a decision made no later than January 11, 2004), and (2) a decision not to adjust the pay bands for 2005 (a decision made no later than November 9, 2004).  In other words, the mere adoption of the FAA's pay policies in 2002 did not "consummate" the allegedly discriminatory practice of which plaintiffs complain, because plaintiffs would have received their January 2004 and January 2005 raises as salary increases if the FAA had decided to increase, rather than freeze, the pay bands for 2004 and 2005.

2.  The January 2004 and January 2005 Lump Sum Payments Are Not the Relevant Decisions

        Plaintiffs argue that the FAA's issuance of lump sum payments in January 2004 and January 2005 constitute the relevant "pay-setting decisions" for purposes of a timeliness analysis.  The Court disagrees with this view as well.

        The Supreme Court in Ledbetter drew a sharp distinction between discriminatory pay-setting decisions – that is, intentional acts that "consummate" a discriminatory pay practice – and "subsequent nondiscriminatory acts that [merely] entail adverse effects resulting from" those decisions.  Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2169-70.  The lump sum payments issued by the FAA in January 2004 and January 2005 are clearly the latter, because under the FAA's compensation policies the agency's "decisions" to issue those lump sum payments were dictated by earlier decisions.  The FAA's compensation policies state that an employee's annual pay raise "*will* be paid as a lump sum payment" if the employee's salary meets or exceeds the pay band maximum.  FAA HR Policy Manual at 3-4.  Therefore, it was a foregone conclusion that those workers whose salaries met or exceeded the pay band maximum in 2004 would receive their annual raises as lump sum payments once the FAA decided, no later than January 11, 2004, not to adjust the pay bands for 2004.  Similarly, it was a foregone conclusion that those workers whose salaries met or exceeded the pay band maximum in 2005 would receive their annual raises as lump sum payments once the FAA decided, no later than November 9, 2004, not to adjust the pay bands for 2005.  Thus, the FAA's "decisions" to issue raises in the form of lump sum payments in January 2004 and again in January 2005 are best viewed as "subsequent nondiscriminatory acts that [merely] entail adverse effects resulting from" earlier allegedly discriminatory acts, because the "decisions" to issue lump sum payments

to some workers in January 2004 and January 2005 were essentially ministerial acts.[10]

        The Court therefore concludes that the FAA's "decisions" to issue lump sum payments in January 2004 and January 2005 are analogous to Goodyear's "decisions" to issue reduced pay checks to Ms. Ledbetter from 1997 onward. In both cases, the "decisions" at issue were nondiscriminatory acts that merely made palpable the adverse effects of earlier allegedly discriminatory acts. Cf. Delaware State College v. Ricks, 449 U.S. at 257-58 (noting that the charging period runs from the date of the discriminatory act, not the date of "delayed, but inevitable consequence[s]" of the act); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 69-70 (D.D.C. 2007) (same). The FAA's decisions to issue lump sum payments in January 2004 and January 2005 therefore do not constitute the relevant pay-setting decisions for purposes of determining whether plaintiffs' complaints are timely.

### 3. The FAA's Pay Band Decisions Are the Relevant Decisions

        In light of the above, the Court concludes that two discrete acts effectively "consummated" the discriminatory practice of which plaintiffs complain – and therefore constitute the relevant pay-setting decisions under Ledbetter. Those discrete acts are (1) the FAA's decision not to adjust the pay bands for 2004 and (2) the FAA's decision not to adjust the

---

[10]    Indeed, plaintiffs seem to agree with this view. They have consistently acknowledged that the issuance of lump sum payments in January 2004 and January 2005 was an inevitable consequence of the FAA's decisions not to adjust the pay bands for 2004 and 2005 – and therefore that the FAA engaged in intentional discrimination, if at all, when it decided not to adjust the pay bands for those years. See 2004 Coghlan Formal Compl. at 2 ("*As a result of the pay bands not being adjusted the past two years*, many FAA employees have not received [annual pay raises] as permanent adjustments to their salary.") (emphasis added); 2005 O'Hara Formal Compl. at 2 (arguing that "the Administrator refused to adjust my pay band, *which in turn* deprived me and all those similarly situated to me of" a salary increase) (emphasis added); 2005 Coghlan Formal Compl. at 2 (same).

pay bands for 2005.  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2169-70;

Nelson v. Univ. of Texas at Dallas, 491 F. Supp. 2d 672, 681 (N.D. Tex. 2007) (Ledbetter holds

that the charging period for a pay discrimination claim runs from the moment "when

compensation was set"); cf. Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (charging period runs

from the date when "the *operative decision* was made – and notice given – in advance of a

designated date on which" adverse consequences would occur) (emphasis added).  Plaintiffs'

obligation to complain of the FAA's allegedly discriminatory conduct was thus triggered when

the FAA decided not to adjust the pay bands for 2004 (no later than January 11, 2004) and when

the FAA decided not to adjust the pay bands for 2005 (no later than November 9, 2004).  As a

result, plaintiffs' claims are timely only if they initiated the EEO process within 45 days of those

two events.

### D.  All Claims Based on 2004 Conduct Are Untimely

The FAA decided not to adjust the pay bands for 2004 no later than January 11,

2004 – that is, when Mr. Coghlan received part of his 2004 annual pay adjustment in the form of

a lump sum payment.[11]  He complained of discrimination for the first time on August 10, 2004 –

---

[11]     As noted above, see *supra* note 6, the parties' papers do not make clear when the
FAA decided not to adjust the pay bands for 2004, nor whether the FAA broadcast this decision
to employees like it broadcast its 2005 pay band decision to employees.  This potentially could
complicate the proper analysis, because it would be unfair to treat the FAA's 2004 pay band
decision as the discrete act triggering plaintiffs' 2004 charging period if the plaintiffs could not
have known of the decision.

Under the facts of this case, however, there is no need to speculate about the
timing and nature of the FAA's 2004 pay band decision.  Plaintiffs' 2004 claims are untimely
even assuming (as plaintiffs do) that the 2004 charging period was triggered on January 11,
2004, when Mr. Coghlan received a pay check reflecting the 2004 pay band decision (and thus
should have been aware of it).

nearly seven months after he received part of his raise as a lump sum payment, and even longer, in all likelihood, after the FAA actually decided not to adjust the pay bands for 2004. Indeed, plaintiffs essentially concede that Mr. Coghlan's failure to seek EEO counseling before August 10, 2004 renders his 2004 complaint untimely. See Pls.' Supp. at 1, 6. Thus, as Mr. Coghlan's untimely complaint is the only basis for plaintiffs' claims based on 2004 events, the Court will enter summary judgment in defendant's favor on all of the claims comprehended by that complaint – including plaintiffs' disparate treatment and disparate impact claims on behalf of Mr. Coghlan and the proposed class.

        Mr. Coghlan and Mr. O'Hara attempt to evade this result – or mitigate it – in two ways. First, they mount a half-hearted challenge to the notion that Mr. Coghlan's claim was untimely. After conceding the point in their first supplemental brief, see Pls.' Supp. at 1, 6, plaintiffs apparently had second thoughts. In a later filing, plaintiffs insist that they meant to imply only that "Coghlan's . . . complaint *may* have been untimely." Pls.' Supp. Reply at 1 (emphasis in the original). According to plaintiffs, Mr. Coghlan's complaint may have been timely because Mr. Coghlan told the EEO counselor to whom he first spoke that he "[l]earned about the disparate treatment for those over 40 on June 28, 2004," rather than on January 11, 2004. 2004 Coghlan Informal Compl. at 2. This is, in effect, a request for this Court to equitably toll the charging period.

        The 45-day period for initiating administrative proceedings is tolled if the employee "did not know and reasonably should not have known that the discriminatory matter or personnel action occurred." 29 C.F.R. § 1614.105(a)(2). Stated another way, "[t]he plaintiff's time for filing an EEOC charge [does not start to run until] the plaintiff has a reasonable suspicion that he has been the victim of discrimination." Johnson v. Gonzales, 479 F. Supp. 2d

55, 59 (D.D.C. 2007); see also Stewart v. Ashcroft, 352 F.3d 422, 425 (D.C. Cir. 2003).  "EEO

procedures are time barred," however, "if the plaintiff knew, or should have known, about the

alleged discriminatory action 45 days prior to his filing of" an administrative complaint.  Aceto

v. England, 328 F. Supp. 2d 1, 7 (D.D.C. 2004).

   There is no genuine dispute that Mr. Coghlan knew or should have known that he

had been the subject of an allegedly discriminatory practice long before June 28, 2004.  Plaintiffs

admit that Mr. Coghlan received a pay raise in the form of a lump sum payment on January 11,

2004, and that he received pay forms documenting that payment.  See Pls.' Facts ¶¶ 21-26.

Given this concrete and documented effect on his own pay, the Court concludes that Mr.

Coghlan should at least have had a "reasonable suspicion" that he had been the victim of a

discriminatory act on or soon after January 11, 2004.  Aceto v. England, 328 F. Supp. 2d at 7;

Johnson v. Gonzales, 479 F. Supp. 2d at 59.  See also Stewart v. Ashcroft, 352 F.3d at 425

(plaintiff's claim was untimely because events should have prompted him to inquire into

possible discriminatory act more than 45 days before he filed his complaint); Harris v. City of

New York, 186 F.3d 243, 248 (2d Cir. 1999) (courts "look not only at what [plaintiffs] actually

knew but also at what [they] had reason to know").[12]

   Second, plaintiffs argue that, even assuming Mr. Coghlan's *individual* claim is

untimely, they should be permitted to maintain their *class* claims based on the FAA's 2004

conduct.  Again, this argument is not entirely clear, but plaintiffs appear to believe that they may

---

   [12] It is also worth noting that in the very same filing in which plaintiffs suggest that
Mr. Coghlan did not become aware of the discriminatory effect of FAA's compensation policies
until June 2004, plaintiffs also argue that Mr. Coghlan became aware of the discriminatory effect
of FAA's compensation policies in January 2004.  See Pls.' Supp. Reply at 5.  This
inconsistency – coupled with the fact that plaintiffs did not assert this position until their final
supplemental filing – suggests that plaintiffs themselves put little stock in this argument.

maintain their class claims under the single filing rule. "The [single filing rule] allows an individual plaintiff, who has not [filed or exhausted a timely] EEOC charge, to satisfy the administrative exhaustion requirements . . . by relying on a charge filed by another plaintiff." Campbell v. Nat'l R.R. Passenger Corp., 163 F. Supp. 2d 19, 25 (D.D.C. 2001); see also EEOC v. Air Line Pilots Ass'n, 885 F. Supp. 289, 293 (D.D.C. 1995) ("The single filing rule provides that 'where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims aris[e] out of similar discriminatory treatment in the same time frame.'") (quoting Snell v. Suffolk County, 782 F.2d 1094, 1100 (2d Cir. 1986) (internal quotation marks and citation omitted)). According to plaintiffs, their class claims based on the FAA's 2004 conduct survive because they may rely on (1) an informal administrative complaint filed by Mr. O'Hara in July 2004 and/or (2) other (unconfirmed) administrative complaints filed by other (unknown) FAA employees. See Pls.' Supp. Reply at 2-4.

       The Court rejects both arguments. First, plaintiffs may not rely on Mr. O'Hara's 2004 administrative complaint because it, too, is untimely under the reasoning of this Opinion. Mr. O'Hara, who received raises in the form of lump sum payments from 2002 onward, knew or should have known of the allegedly discriminatory effects of the FAA's policies long before the summer of 2004. See EEOC v. Air Line Pilots Ass'n, 885 F. Supp. at 293 (single-filing rule permits non-filing plaintiff to piggy-back on another plaintiff's *timely* claim). Second, even assuming that other FAA employees did file administrative complaints based on the FAA's 2004 conduct – an assertion for which plaintiffs provide no evidence – plaintiffs may not rely on those complaints. The single-filing rule permits non-filing employees to join with other employees who have already filed suit. See Bettcher v. Brown Schools, Inc., 262 F.3d 492, 494-95 (5th Cir. 2001). Here, of course, Mr. Coghlan and Mr. O'Hara identify no other suit for them to join; they

merely seek to maintain their own suit on the basis of unconfirmed complaints by unidentified

FAA employees.  The single-filing rule does not contemplate such a broad exception to the

exhaustion requirement.  See Bettcher v. Brown Schools, Inc., 262 F.3d at 494-95; see also

Caban v. Sedgwick County Sheriff's Dep't, Civ. Action No. 98-1196, 2001 WL 487905, at *16

(D. Kan. 2001); EEOC v. Air Line Pilot Ass'n, 885 F. Supp. 290 (the single filing rule "assumes

that at least one *plaintiff in a lawsuit* did file a timely EEOC charge") (emphasis added).

### E.  All Claims Based on 2005 Conduct Are Untimely

Plaintiffs' 2005 claims are also time-barred.  As noted above, see *supra* at 11, 15,

on November 9, 2004, the FAA Administrator

> held a town hall meeting where she, in relevant part, advised all
> FAA employees, who attended the meeting either in person or via
> a web cast, or who read the statements on the employee website,
> that the latest market survey data did not support an increase of the
> pay bands [for 2005].

Def.'s Supp. at 6.  As a result, by November 9, 2004 plaintiffs knew or should have known that

the FAA had decided not to adjust the pay bands for 2005, and thus "that they would receive

their annual pay adjustments as a lump sum payment because the pay bands would not be

increased."  Id.  Mr. Coghlan and Mr. O'Hara do not dispute that this meeting took place, that

the information about the Administrator's decision was conveyed to FAA employees, or even

that they knew or should have known of the information conveyed during that meeting.  See Pls.'

Supp. Reply at 6-7.  Instead, plaintiffs merely insist that none of the above "establish[es] that

employees understood [the] consequences" of the FAA's decision not to increase the pay bands

in 2005 – namely, that the "January 2005 discretionary pay increases would disadvantage older

employees."  Id.

23

This response is unavailing.  By November 9, 2004, Mr. Coghlan and Mr. O'Hara had already filed several administrative complaints arguing that the Core Compensation System, as implemented by the FAA, discriminated against older workers.  Moreover, as noted above, these complaints demonstrate that plaintiffs had identified the annual pay band decisions as the relevant pay-setting decisions long before November 9, 2004.  See 2004 Coghlan Formal Complaint at 2 ("*As a result of the pay bands not being adjusted the past two years*, many FAA employees have not received [annual pay raises] as permanent adjustments to their salary.") (emphasis added); id. at 3 (asking the EEOC to "[r]equire the FAA to ensure that the upper limit of the base pay bands are increased each year to account for [annual pay raises]," and observing that "[t]his will eliminate the disparate impact caused by the current policy and practice").  Thus, plaintiffs knew or should have known that the Administrator's decision not to adjust the pay bands for 2005 would have precisely the same (allegedly discriminatory) effect it had in the previous year.

In sum, there is no genuine dispute that plaintiffs knew or should have known about the FAA Administrator's decision not to adjust the pay bands on November 9, 2004 (or very soon thereafter).  Nor is there any genuine dispute that plaintiffs knew or should have known that this pay-setting decision was potentially discriminatory, because plaintiffs had already argued that an earlier, identical decision by the Administrator was discriminatory.  Therefore, plaintiffs should have initiated administrative proceedings within 45 days of that decision.  Instead, Mr. O'Hara did not seek EEO counseling until February 23, 2005, and Mr. Coghlan did not file an administrative complaint until March 23, 2005.  Thus, all claims based on the FAA's 2005 conduct are time-barred, and the Court will enter summary judgment for defendant on those claims.

# VI.  PLAINTIFFS' MISCELLANEOUS THEORIES

## A.  The "Continuing Violation" Doctrine

Plaintiffs argue that their disparate treatment claims survive under a "continuing violation" theory.  See Pls.' Supp. at 7-9.  Under that theory, plaintiffs may recover for allegedly discriminatory conduct falling outside the applicable charging period if that conduct forms part of one indivisible discriminatory practice and at least one act in furtherance of that practice took place within the applicable charging period.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111-18 (2002).  Generally speaking, at least since the Supreme Court's decision in Morgan, the theory is restricted to hostile work environment claims because a hostile work environment violation – unlike a discrete act such as firing or failing to promote an employee – "cannot be said to occur on any particular day."  Id. at 115, 117; see also Haynie v. Veneman, 272 F. Supp. 2d 10, 16-17 & n.4 (D.D.C. 2003).

Initially, plaintiffs' continuing violation theory amounted to what the Supreme Court has disapprovingly labeled a "hostile salary environment claim."  Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2175 n.7.  Plaintiffs simply argued that "each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge [pay checks within that charging period and] any prior discriminatory conduct that impacted the amount of that paycheck, no matter how long ago the discrimination occurred."  Id. at 2172; see also Pls.' Opp. at 14-15.  Presumably because Ledbetter foreclosed this theory, see Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2175-76 & n.7, plaintiffs now appear to argue that the January 2004 and January 2005 lump sum payments themselves constitute "continuing violations."  See Pls.' Supp. at 7-9.

This argument does not salvage any of plaintiffs' claims.  Again, the lump sum

payments and their negative financial consequences were mere effects of the allegedly

discriminatory pay band decisions – not intentionally discriminatory acts themselves.  See *supra*

at 15-18.  As the D.C. Circuit has explained, "an untimely suit cannot be revived by pointing to

effects within the limitations period of unlawful acts that occurred earlier."  Taylor v. FDIC, 132

F.3d 753, 765 (D.C. Cir. 1993); see also Law v. Continental Airlines Corp., Inc., 399 F.3d 330,

333 (D.C. Cir. 2005) (same).


## B.  *Bazemore v. Friday*

Finally, while it is not entirely clear, plaintiffs appear to argue that they may

maintain at least some of their claims against the FAA under the decision and reasoning of the

Supreme Court in Bazemore v. Friday, 478 U.S. 385 (1986).  See Pls.' Supp. at 7-9.  The

Supreme Court explained Bazemore, in Ledbetter, as follows:

> Bazemore stands for the proposition that an employer . . . triggers
> a new EEOC charging period whenever the employer issues
> paychecks using a discriminatory pay structure.  But a new . . .
> violation does not occur and a new charging period is not triggered
> when an employer issues paychecks pursuant to a system that is
> facially nondiscriminatory and neutrally applied.

Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. at 2174 (internal quotation marks and

citation omitted).  In other words, "Bazemore holds that an employee may recover for

discriminatorily low pay received within the limitations period [pursuant to a system that is

facially discriminatory or not neutrally applied] because each pay check [under such

circumstances] constitutes a discrete discriminatory act."  Shea v. Rice, 409 F.3d 448, 455 (D.C.

Cir. 2005).  Bazemore and its progeny permit plaintiffs to recover for pay checks received within

45 days of their administrative complaints, not for pay checks or related conduct that occurred

outside that period.  See Shea v. Rice, 409 F.3d at 451.

26

Plaintiffs' reliance on <u>Bazemore</u> is misplaced.  As Judge Williams has noted, the case law often makes it difficult to distinguish "between cases where a plaintiff can recover for the current consequences of a discrete discriminatory act in a time-barred period and cases where he or she may not."  <u>Shea v. Rice</u>, 409 F.3d at 456 (Williams, J., concurring).  Judge Williams has helpfully suggested that "the distinction turns . . . on whether one may reasonably characterize the defendant employer as applying a discriminatory salary structure in the unbarred period."  <u>Id</u>.  Here, no reasonable factfinder could conclude that the FAA applied a "discriminatory salary structure" for purposes of this analysis.  Plaintiffs do not argue that the FAA's policies were adopted for discriminatory purposes, <u>see</u> Pls.' Supp. Reply at 6; they concede that the FAA's compensation policies are "indisputably facially neutral," Pls.' Supp. at 7; and they do not contend that the decisions to issue lump sum payments in January 2004 and January 2005 were themselves infected with discriminatory animus.  <u>See</u> <i>supra</i> note 10.  At most, plaintiffs argue that the FAA engaged in certain time-barred conduct – that is, deciding not to adjust pay bands such that certain employees earning the pay band maximum received raises as lump sum payments – knowing that such conduct would have negative consequences for some workers over 40.  <u>See</u>, <u>e.g.</u>, Am. Compl. ¶ 30; <u>see also</u> Pls.' Supp. Reply at 6.  This is simply not enough to align this case with <u>Bazemore</u> and its progeny.

In <u>Bazemore</u> and its progeny, the employers applied salary structures during the unbarred periods that were so clearly, intentionally and pervasively discriminatory that courts were willing to assume that each pay check was issued with discriminatory intent, and thus constituted a discrete act of discrimination.  <u>See</u>, <u>e.g.</u>, <u>Bazemore v. Friday</u>, 478 U.S. at 395 (salary structure discriminatory during unbarred period because it was based on pre-Title VII structure that explicitly discriminated against African Americans); <u>Anderson v. Zubieta</u>, 180

F.3d 329, 334-35 (D.C. Cir. 1999) (salary structure discriminatory during unbarred period because it clearly treated black American citizens of Panamanian or Hispanic national origin differently than similarly situated white American citizens).  But even viewing the record in this case in the light most favorable to plaintiffs, no reasonable factfinder could conclude that FAA, like the employers in <u>Bazemore</u> and <u>Zubieta</u>, purposely applied "a two-class pay structure based on a forbidden criterion" during the unbarred periods.  <u>Shea v. Rice</u>, 409 F.3d at 458.  Thus, plaintiffs may not sue the FAA on the theory that each pay check they received within the unbarred period constituted a discrete act of discrimination.

       For the reasons stated in this Opinion, the Court granted summary judgment in favor of the defendant by an Order and Judgment issued on March 31, 2008.

       SO ORDERED.


                           /s/_____
                           PAUL L. FRIEDMAN
                           United States District Judge

DATE: May 28, 2008